[S. F. No. 11939. In Bank.—May 31, 1928.]

THE PEOPLE, etc., Appellant, v. VENTURA REFINING
COMPANY (a Corporation), Respondent.

U. S. Webb, Attorney-General, and Frank L. Guerena, Deputy Attorney-General for Appellant.

Charles W. Slack and Edgar T. Zook for Respondent.

PRESTON, J.—This is an action by the People against the defendant to recover the two cent per gallon license or excise tax provided by the Gasoline Tax Act (Stats. 1923, chap. 267, p. 571) upon 2,041,922 gallons of motor vehicle fuel sold by defendant to five different concerns under five different executory contracts of sale made prior to May 14, 1923, the completed sales being made during the first quarter of the year 1924. Defendant had judgment and plaintiff People have appealed on a stipulation of facts, a provision of which is that should plaintiff finally

prevail, it shall have judgment against defendant for the sum of $40,822.86, together with interest and costs as prayed for in the complaint.

 Each of the five executory contracts above referred to contains a price-fixing provision substantially as follows: "The price fixed for gasoline deliverable hereunder contemplates that the jobber shall be entitled to a spread, or margin, of one and one-half (1½) cents per gallon of delivery hereunder, to compensate him fully for his outlay and services in receiving, storing and distributing gasoline delivered hereunder to the trade in tank-wagon lots and should any federal, state, municipal or district tax, or taxes, be imposed on gasoline deliverable hereunder, not to the extent thereof reflected in the prevailing price at which standard grades of gasoline, conforming to U. S. Navy specifications, then in effect may be sold in tank-wagon lots at . . . California, at time of such delivery, the basis for arriving at the price of gasoline to the jobber then remaining deliverable hereunder shall be so altered as to insure to the jobber such spread, or margin, of one and one-half (1½) cents per gallon of delivery hereunder, to compensate him fully for his outlay and services in receiving, storing and distributing gasoline, then remaining deliverable hereunder."

These contracts were interpreted in practical operation as follows: "That each and all of the said sales and deliveries of gasoline embraced in the said sales of the said aggregate amount of 2,041,144 gallons were made to the purchaser thereof at a price one and one-half (1½) cents less than the prevailing price at which standard grades of gasoline, conforming to the United States Navy specifications, then in effect, was being sold in tank-wagon lots at the several places of delivery provided in the said respective contracts; that the said prevailing price was determined by the price at which Standard Oil Company, Shell Oil Company, Union Oil Company and Associated Oil Company were then selling gasoline in the territories mentioned in the said several contracts; and that, at the time that the license tax provided in the statute hereinabove referred to went into effect, the prevailing price of such gasoline was increased by the action of the said last mentioned corporations two (2) cents per gallon over the price at which such gasoline had been selling prior thereto."

The statute referred to is the so-called Gasoline Tax Act hereinbefore cited, which is entitled: "An act to regulate and license the business of producing, refining or distributing gasoline distillate and other motor vehicle fuels . . . " Section 1 defines certain terms used in the act. Section 2 provides for the registration of distributors of motor vehicle fuel. Sections 3 and 4 fix the amount of the tax at two cents per gallon of fuel distributed and the time for payment thereof. Sections 5 to 9 make certain provision for records to be kept by the distributor and the manner of computation of the tax. Then follows section 10, a portion of which, constituting the basis of controversy here, reads as follows: "The provisions of this act requiring the payment of license fees shall not be held or construed to apply to . . . (c) any motor vehicle fuel delivered under contracts entered into prior to the fourteenth day of May, 1923 . . . "

The question presented for our consideration under these facts is: May the respondent in this action rely upon the exemption last above quoted and refuse to comply with the demand of the state for the payment of said tax so levied?

It is the contention of respondent that the language of the statute proclaiming the exemption contains no uncertainty or ambiguity, but in plain words applies to any contract executed prior to May 14, 1923, the terms of which require the distributor to deliver motor vehicle fuel pursuant thereto.

The contention of the People, on the other hand, is that the exemption in said provision cannot be thus broadly interpreted but must be limited to that class of contracts which contain as an integral part thereof a provision which compels the distributor to sell and deliver motor vehicle fuel at a fixed price and prevents him from adding the two-cent tax thereto. In other words, the contention of the People is that the tax in reality is not paid by the distributor but is collected from the consumer, and that any contract which allows the distributor to reimburse himself for the tax levied is not within the terms of said exemption. The contention is further made that under the plain terms of the contracts here in suit, coupled with the further facts found, the price was not fixed, but, on the contrary, the distributor not only had the right to add the tax to the

selling price but in effect it was added and actually passed on to the consumer. It is further urged by the People that if the broad interpretation contended for by defendant is indulged the effect will be to render the whole tax exemption unconstitutional and void because when thus interpreted it is discriminatory in character, inasmuch as there is no reasonable basis for declaring that a sale made at a price to be thereafter determined under an executory contract made prior to May 14, 1923, differs from a sale made under a similar contract of subsequent date.

■ Where the interpretation claimed leads to injustice, oppression or to absurd consequences, the general terms used in a statute will be limited in their scope so as to avoid such a result. In *Ex parte Lorenzen,* 128 Cal. 431, 438, 439 [79 Am. St. Rep. 47, 50 L. R. A. 55, 61 Pac. 68], the court had before it a city penal ordinance regulating the issuance and delivery of street-car transfers and prohibiting the giving of them by passengers to others for their use in continuing the journey over a connecting road. The ordinance, if literally enforced, would have made it a penal offense for a passenger, after paying the fare of himself and his family or guests and securing transfers, to deliver such transfers to the other members of his party. The court, restricting the literal language of the ordinance and holding that the legislation did not apply to an innocent use of a transfer, said: "But for the more substantial objection that the ordinance by its terms would oppress and lead to the conviction of persons guilty of no fraudulent act, it is to be remembered that the letter of a penal statute is not of controlling force, and that the courts, in construing such statutes, from very ancient times have sought for the essence and spirit of the law and decided in accordance with them, even against express language; and in so doing they have not found it necessary to overthrow the law, but have made it applicable to the class of persons or the kind of acts clearly contemplated within its scope."

The above language is cited with approval in *People* v. *Earl,* 19 Cal. App. 69, 71, 72 [124 Pac. 887]. In that case the defendant was indicted under a section of the Penal Code prohibiting the disclosure by any person of a telegraphic or telephonic message addressed to another, without permission of the addressee. Limiting application of the

statute to offenses committed by persons having a duty to perform with respect to the dispatch, transmission, or delivery of such messages, in accordance with the obvious legislative intent, the court said: "The function of the courts in construing statutes is not constricted to a view which shall give literal effect to every word and phrase appearing by the letter of the law. In that analysis reason must have its just proportion, and the intent of the lawmakers is to be ascertained by taking into account several considerations, as: the history of the legislation upon the subject treated of, and concurrent legislation affecting the same or closely kindred subjects. The fact that the enforcement of a statute according to its literal import will have the effect of prohibiting otherwise necessary and useful acts may also furnish an entirely sufficient reason for concluding that the intent of its framers was not that it should so operate. Our supreme court, in *Ex parte Lorenzen,* 128 Cal. 431 [79 Am. St. Rep. 47, 50 L. R. A. 55, 61 Pac. 68], has declared the rule thus: (citing from said case the language hereinabove quoted) . . . As an illustration the old Bologna law, which provided in literal terms for the punishment of a person who should let blood in the streets and which was held not to apply to a barber performing the office of a surgeon, is given, among others. This expression of Mr. Justice Field, used in *United States* v. *Kirby,* 7 Wall. 482 (19 L. Ed. 278), is also quoted: 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice or oppression or an absurd consequence. It will always be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' "

The rule is followed in *In re Haines,* 195 Cal. 605, 612, 613 [234 Pac. 883, 885], where the court extended the application of the provisions of a penal statute to both classes of prisoners, misdemeanor and felony, although the precise language thereof included only "Every prisoner charged with or convicted of a felony." It is there said: "*Matter of Zany,* 20 Cal. App. 360 [129 Pac. 295], is cited by respondent to the effect that a statute should always be so construed as to give a sensible and intelligent meaning to every part to avoid absurd consequences and, if possible, so as to make every

provision thereof valid and effective. General terms should be so limited in their application as not to lead to an absurd consequence. (*People* v. *Earl*, 19 Cal. App. 69 [124 Pac. 887].) To arrive at the legislative intent in the interpretation of statutes the original purpose and object of the legislation must be considered. (*Mackey* v. *Mott*, 25 Cal. App. 110 [142 Pac. 1082].) Statutes must be read and considered in conjunction with the legislative intent and then be liberally construed with the object in view of giving effect to such intent. (*Odell* v. *Rihn*, 19 Cal. App. 713 [127 Pac. 802].) A construction or conclusion plainly not contemplated by the legislature should not be given to a statute if it can be avoided. When a statute is fairly susceptible of two constructions, one leading inevitably to mischief or absurdity and the other consisting of sound sense and wise policy, the former should be rejected and the latter adopted. (*San Joaquin & K. R. C. & I. Co.* v. *Stevinson*, 164 Cal. 221 [128 Pac. 924].)

"Absurd or unjust results will never be ascribed to the legislature, and it will not be presumed to have used inconsistent provisions as to the same subject in the immediate context. The courts will be astute to avoid such results (*Wells Fargo & Co.* v. *Mayor etc. of Jersey City*, 207 Fed. 871). In the interpretation of statutes courts are not bound by grammatical rules, and may ascertain the meaning of words by the context. (*Cavender* v. *Hewitt*, 145 Tenn. 471 [22 A. L. R. 755, 239 S. W. 767].)

" 'The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. "While the intention of the legislature must be ascertained from the words used to express it, the manifest reason and the obvious purpose of the law should not be sacrificed to a literal interpretation of such words." Words or clauses may be enlarged or restricted to effectuate the intention or to harmonize them with other expressed provisions. Where general language construed in a broad sense would lead to absurdity it may be restrained. The particular inquiry is not

what is the abstract force of the words or what they may comprehend, but in what sense they were intended to be used as they are found in the act.' (Lewis' Sutherland on Statutory Construction, 2d ed., sec. 376, p. 721.)''

In the case of *People* v. *Kaufman*, 49 Cal. App. 572 [193 Pac. 953], defendant was charged with violation of a section of the Motor Vehicle Act [Stats. 1915, p. 409], requiring the driver of a motor-car which had collided with another to take anyone who was riding in the other car to a surgeon upon the request of such person. Holding that the statute should not be so strictly construed against one accused of felony as to make it applicable to the facts of the case, the court said: "In the present case the complaining witness was driving alone. With the appellant, in the car he was driving, were four other persons. If none of them was hurt or required medical or surgical treatment, any one of the five in the appellant's car might first have asked the complaining witness for transportation to a surgeon, and he might have been accused of felony if he had said 'there is no reason why I should provide transportation for you.' Upon no reasonable hypotheses can the criminality of either of two actors be made to depend entirely upon which of the two shall first make a request of the other. Every statute must receive reasonable construction, and this is particularly true of statutes defining crimes. 'It is to be remembered that the letter of a penal statute is not of controlling force, and that the courts in construing such statutes, from very ancient times have sought for the essence and spirit of the law and decided in accordance with the them, even against express language; and in so doing they have not found it necessary to overthrow the law, but have made it applicable to the class of persons or the kind of acts clearly contemplated within its scope.' (*Ex parte Lorenzen*, 128 Cal. 431 [79 Am. St. Rep. 47, 50 L. R. A. 55, 61 Pac. 68].) 'General terms should be so limited in their application as not to lead to injustice or oppression or an absurd consequence.' (*People* v. *Earl*, 19 Cal. App. 69–72 [124 Pac. 887, 888]; *United States* v. *Kirby*, 7 Wall. (U. S.) 482 [19 L. Ed. 278]; see, also, Rose's U. S. Notes.)''

██ Applying these principles to the provisions of the statute before us, we do not hesitate to declare the legislative intent to be that contracts of the type here considered

should not be exempted from consideration in measuring the amount of the tax imposed. The clear intent of the law was to levy an excise or occupation tax upon distributors of motor vehicle fuel, giving such distributors, however, ample opportunity to fully indemnify themselves by adding the amount of the tax to the selling price of the fuel and thus in effect collect the tax from the consumer. The exemption, in other words, was to be a shield for their protection, but not a sword to be used for gaining a profit from the public. It is admitted in this case that in practical effect the two-cent tax was added to the selling price by respondent and presumably indirectly paid by the consumer.

There is, therefore, no equity in the contention of respondent. We hold the exemption to be inapplicable to any executory contract of sale entered into prior to May 14, 1923, which in terms or in effect permits the distributor to protect himself against operation of the tax by securing a price for the fuel sold which may have as an added constituent factor thereof a sum equivalent to the tax fixed by said statute.

The same result is also reached by holding as we do that to broadly apply the exemption to contracts such as are here in suit would be to create an unwarranted and baseless discrimination in the operation of said statute in that it would confer a benefit upon certain persons and corporations which is denied to others under the same circumstances in violation of article I, section 11, article I, section 21, and article IV, section 25, subdivision 19, of the constitution. The statute is prospective in its operation and the tax imposed is measured by completed sales made after its enactment and during its operation. It is a tax measured by completed and not executory sales. All deliveries made under executory contracts which do not fix a selling price are in the same class regardless of the date of execution of such contracts.

It is in no sense an interference with the obligation of a contract to impose a tax upon a future sale to be made thereunder where the seller is given free rein to add to the selling price of such commodity the tax imposed by law. Whether the executory contract of sale in such case be made on one date or another is entirely immaterial. Under the exemption here considered and applied to the contracts be-

fore us a sale made thereunder on January 1, 1924, will be exempt, whereas a sale under a contract dated May 15, 1923, identical in all other respects, made at the same time and at the same price, will be taxed. The provision of the statute here under consideration could not validly operate, therefore, to effect the object contended for by respondent.

Again we see no answer to the contention that the exemption set forth was enacted solely for the benefit of the distributor and under the facts here shown respondent by adding the two cents to the selling price of its product es-. topped itself to claim the benefit of said exemption. ■ Section 3513 of the Civil Code provides: "Any one may waive the advantage of a law intended solely for his benefit. . . . " It has been held many times in this state and the rule is universal that a party may waive the benefits specially conferred upon him by statute or constitution. (6 Cal. Jur., sec. 78, p. 120; 5 Cal. Jur., sec. 55, p. 626; *Wells Fargo & Co.* v. *Enright*, 127 Cal. 669 [49 L. R. A. 647, 60 Pac. 439]; *State Loan etc. Co.* v. *Cochran*, 130 Cal. 245 [62 Pac. 466, 600]; *Knarston* v. *Manhattan L. Ins. Co.*, 140 Cal. 57, 63 [73 Pac. 740].) When this waiver is made, estoppel to rely on the exemption will arise in any case where it is inequitable or unjust to permit it.

In Maine a statute in the nature of imprisonment for debt exempts a married woman from arrest for tort in an action for damages against her, but it does not exempt a single woman in a like case. In holding that defendant by posing as a *femme sole* when in fact she was a *femme covert* waived the exemption, the court in the case of *Kallock* v. *Elward*, 118 Me. 346 [108 Atl. 256, 8 A. L. R. 750, 752], said: "In the case at bar the exemption is created by statute, but there is no reason why the doctrines of waiver and estoppel should not apply and work their legitimate effects the same as if the exemption were created at common law or under the Constitution. A statute cannot stand in the way of waiver or equitable estoppel when the facts demand their application in the interests of justice and right."

Also in *Hallowell Nat. Bank* v. *Marston*, 85 Me. 488 [27 Atl. 529], it is said: "A statutory or even a constitutional provision, made for one's benefit, is not so sacred that he may not waive it, and having once waived it he is estopped from thereafter claiming it."

It seems clear to us, for reasons based upon public policy if upon no other ground, that respondent may not deny that it has waived the right to rely on the exemption by collecting the equivalent of the tax indirectly from the public. And this must follow even though by its terms said exemption would otherwise shield and protect it. If it be said that in no event is the state entitled to the tax, the ready answer is that respondent was able to secure this advantage by reason of the statute, and public policy forbids it to deny the full operation of said section 3 of the act under which it is entitled in the absence of an exemption to the tax here claimed.

The judgment of the court below is reversed and the cause remanded with directions to enter judgment for plaintiff and against defendant for the sum of $40,822.86 with interest and costs as prayed.

Richards, J., Shenk, J., Waste, C. J., and Curtis, J., concurred.

LANGDON, J., Dissenting.—I dissent. There is no uncertainty or ambiguity in the language of the statute under consideration, and, consequently, no occasion for judicial construction. Such statute provides that it "shall not be held or *construed* to apply to . . . (c) any motor vehicle fuel delivered under contracts entered into prior to the fourteenth day of May, 1923. . . . " The legislature may have had in mind, as contended by the attorney-general, only contracts providing a fixed price for fuel, but it has not so restricted the term and to amend the statute by judicial construction seems to me an usurpation of legislative power which is unjustified even in the interests of public policy.

Rehearing denied June 29, 1928, and the following opinion then rendered thereon:

THE COURT.—On petition for rehearing herein it is urged that this court has erroneously "assumed that there were two types of contracts in existence, i. e., contracts having (a) a fixed sales price, and (b) a flexible sales price," whereas, it is insisted, "it is apparent from the record either directly or by necessary inference that the so-called fixed price contracts do not exist." It is therefore contended that

a conclusion cannot be drawn that the legislature had in mind two types of contracts and by its action intended to provides only for a fixed price contract. Assuming that the record is susceptible to the construction placed upon it by counsel, namely, that only flexible sales contracts were in existence at the effective date of the act, the correctness of the conclusion that the contractors thereunder would be in no different situation so far as the license tax was concerned than those having no contracts outstanding is further emphasized. The opportunity of those in each class to protect themselves against the burden of the license tax was the same. The operation of the law with the exemption in it would therefore confer upon those attempted to be exempted a special privilege or immunity not accorded to others similarly situated. The exemption, then, would effect an unlawful discrimination as between those in the same class and would be void under section 21 of article I of the constitution. (See *Bacon Service Corporation* v. *Huss,* 199 Cal. 21 [248 Pac. 235].) The fact that the unlawful exemption was stricken from the statute by later enactment of the legislature could not affect the petitioner's obligations under the act with the void exemption in it. The petition for a rehearing is denied.