[No. A019483. First Dist., Div. Four. Sept. 22, 1986.]

RICHARD McKEON et al., Plaintiffs and Respondents, v.
HASTINGS COLLEGE OF THE LAW et al., Defendants and Appellants.

878

880

## COUNSEL

Peter W. Davis, James C. Martin and Crosby, Heafey, Roach & May for Defendants and Appellants.

Thomas W. Pulliam, Jr., for Plaintiffs and Respondents.

Arnold C. Sternberg and Frances E. Werner as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

SABRAW, J.—In 1973-1974, defendant and appellant Hastings College of the Law (Hastings) began acquiring real property, including several residential hotels and apartment buildings, in order to expand its campus in downtown San Francisco. Pursuant to the Relocation Assistance Act,[1] Hastings began efforts to facilitate resettlement of the tenants who might be displaced by the expansion project. Among these efforts were the renovation of two of the residential hotels in which displaced tenants were offered

---

[1]The Relocation Assistance Act was added to the Government Code in 1969 (Stats. 1969, ch. 1489, § 1, p. 3043) and has been the subject of significant subsequent amendments. It currently appears as chapter 16 ("Relocation Assistance," commencing with § 7260) of division 7 of title 1 of the Government Code. The statutory scheme was enacted in response to, and is patterned after, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 United States Code section 4601 et seq. (See generally Comment, *Relocation Assistance In California: Legislative Response To The Federal Program* (1972) 3 Pacific L.J. 114.) Another progenitor is the Federal Housing Act of 1949, 42 United States Code section 1441 et seq.

substitute subsidized housing. Hastings also established a committee to advise it in planning and implementing the relocation program.

Beginning in 1977 and continuing into 1978, a dispute arose between Hastings and a substantial number of the advisory committee regarding the sufficiency of Hastings's relocation plan. A number of dissentient committee members withdrew from the committee and founded the Coalition for Adequate Relocation (COFAR). Together with Richard McKeon and Avery Montgomery, former tenants of residential hotels acquired by Hastings for the expansion site, COFAR commenced the present action by filing a complaint for declaratory and injunctive relief.[2] The gist of plaintiffs' complaint was that Hastings's relocation plan failed to provide the full measure of benefits required by the Relocation Assistance Act. The case was tried by the court, which entered a judgment (in the form of a mandatory injunction) requiring Hastings to provide 375 units of "comparable replacement housing." Hastings appeals from the judgment.

I

The issues raised on the appeal require that the chronological sequence of material events and circumstances be summarized in close detail. The following recitals derive from the entire record, including evidence in the form of exhibits and testimony received at the trial:

As of 1971 Hastings had outgrown its existing facility located at the northeast corner of Hyde and McAllister Streets. The number of students and faculty were far in excess of those for which the building was designed. There was an acute shortage of space for classrooms, offices, ancillary services, and the library was substantially below the requirements for a law school of Hastings's size.

Hastings decided to alleviate this overcrowding and to improve the scope and variety of its educational resources by building a "law center complex." Construction was planned in two stages. First, the "Academic Facility," funded by the State of California and a federal grant, would provide additional office space, support facilities, and an expanded library relocated from the older building. Second, the "Community Legal Affairs Facility" would house a number of clinics, community services, and specialized educational programs. An open air "plaza" was also contemplated.

---

[2]Named as defendants were Hastings, its board of directors, and Marvin J. Anderson, who at all pertinent times was Hastings's dean. The designation "Hastings" will henceforth in this opinion refer to either the collective group of defendants named in the complaint or to Hastings in its individual institutional identity, as may be appropriate to the matter in discussion. McKeon, Montgomery, and COFAR will be referred to "plaintiffs."

Hastings intended to construct the complex on the block immediately adjacent to its existing facility. This block is bounded to the north by Golden Gate Avenue, on the east by Hyde Street, to the south by McAllister Street, and to the west by Larkin Street. A number of residential hotels and apartment buildings were situated on this block. During the period from approximately 1972 to 1974, Hastings began negotiations to purchase certain of these properties. Five of these buildings are central to this litigation:

—*The Eureka Hotel,* 365 Golden Gate Avenue, was acquired on February 1, 1974. It had 53 units.

—*The Philadelphia Hotel,* 349 Golden Gate Avenue, was acquired on January 1, 1974. It had 27 units.

—*The Larkin Hotel,* 324 Larkin, was acquired on June 1, 1973. It had 24 units.

—*The Plaza Apartments,* 250 McAllister Street, was acquired on March 1, 1974. It had 35 units.

—*The Ramona Apartments,* 260 McAllister Street, was acquired on January 1, 1973. It had 19 units.[3]

None of these buildings would be affected by the Academic Facility, which Hastings planned to erect on land it already owned. Construction of the Community Legal Affairs Facility, however, was planned to require space occupied by the Eureka and Philadelphia hotels.

Although the parties did not focus on demographic information concerning the area in which the buildings were located (quite possibly because the trial court is only two blocks away from the site of the proposed law center and the court would presumably be aware of the neighborhood), certain characteristics may safely be inferred from the record. The buildings acquired by Hastings are within an area commonly known as the Tenderloin district. It is honeycombed with residential hotels and apartment buildings comparable to those acquired by Hastings. The units within these buildings

---

[3]With the exception of the Larkin Hotel, the record does not establish the precise number of housing units for each of the properties with any degree of reliable exactitude. The figures used here were provided by Hastings during discovery, subsequently used by plaintiffs at trial, and do not appear to be disputed. These figures include five units in the Eureka and Philadelphia hotels which Hastings demolished in order to provide adequate access to fire escapes.

Hastings also purchased another hotel—the Madonna—which was located on the same block and which has a peripheral importance to this litigation. (See fn. 5 and accompanying text, *post.*)

are generally classified as "single room occupancy," generally furnished but which commonly lack individual kitchen and bathroom facilities. A substantial number of tenants are elderly who subsist on fixed incomes comprised of social security, disability, and other forms of governmental assistance. Many tenants, however, are not elderly and tend to have a pattern of transiency. Turnover of tenants is significant but less pronounced among the elderly.

As previously mentioned, the last of the pertinent buildings purchased by Hastings was acquired in March of 1974. From that time until the early part of 1977, the record does not establish precisely what Hastings was doing. In about March of 1977 Hastings established a Community Housing Committee as required by the guidelines promulgated by the Commission (now Department) of Housing and Community Development to implement the Relocation Assistance Act.[4] (See Cal. Admin. Code, tit. 25, § 6012; see also Gov. Code, § 7261; Cal. Admin. Code, tit. 25, § 6038, subd. (b)(12).) The committee's membership included faculty and students at Hastings, residents and commercial tenants of the proposed site and surrounding areas, plus representatives of numerous private and public organizations such as the YMCA, the San Francisco Neighborhood Legal Assistance Foundation (SFNLAF), and the San Francisco Human Rights Commission.

Also in March, Hastings had an open meeting with tenants from all of the acquired buildings. According to one witness, this meeting "caused a real upheaval among the tenants," who were uncertain as to the effect of the acquisitions. There were widespread rumors in the neighborhood that the buildings would be demolished and all residents forced to move.

As a result of this meeting, Hastings hired Diane Albrecht the following month. Albrecht began working as a relocation counselor, and several months later was made Hastings' relocation director. Albrecht began interviewing tenants in all of the Hastings-acquired buildings in April and May for the purpose, she testified, of ascertaining "what the needs of those people were, and who they were, and where they would like to live, and just to find out . . . if they were to be displaced what their needs would be."

---

[4]The guidelines, which appear as chapter 6 ("California Relocation Assistance and Real Property Guidelines," commencing with § 6000) of title 25 of the California Administrative Code, were mandated by former Government Code section 7268. This statute was repealed in 1980, but its substance was reenacted as Government Code section 7267.8 and Health and Safety Code section 50460. (See Stats. 1980, ch. 1182, §§ 1-3, pp. 3959-3960.)

The trial court, upon request by plaintiffs and as required by law (see Evid. Code, § 451, subd. (b); Gov. Code, §§ 11343.7, 11343.8), took judicial notice of these guidelines which were promulgated in October of 1976 and became effective on January 1, 1977, as well as an earlier version ("State of California Relocation Guidelines—Guidance for Agency Implementation of California Relocation Assistance Act") dated October 17, 1973.

In May and June of 1977, Albrecht began conducting a survey of tenants of the Eureka and Philadelphia hotels. Albrecht was aware of the rumors circulating through the community, and one of the purposes of the survey was to allay the tenants' fears of eviction. Albrecht told the tenants that Hastings was not asking them to leave. (See fn. 6, *post.*) The survey was discontinued at the request of the SFNLAF representative on the Community Housing Committee until Hastings had completed a relocation plan.

In April of 1977, at the "suggestion" of the Community Housing Committee, Hastings and Albrecht helped to design a program to trace the whereabouts of tenants who had moved from buildings during the 90-day period prior to acquisition by Hastings. The tracing program was initially confined to former residents of the Eureka and Philadelphia hotels, but it was subsequently expanded to all previous tenants of all of the buildings. The program consisted of various procedures, including checking ledgers of past tenants, consulting existing tenants, and placing notices in several local general circulation newspapers. Albrecht testified that "the most active part of the tracing" occurred in April, May, and June 1978, and that approximately 150 former tenants were eventually located.

It appears that from December of 1976 and throughout most of 1977 Hastings was continually submitting revised drafts of its relocation plan to the Community Housing Committee, which was rejecting the drafts with equal regularity.

It also fairly appears that as of the end of 1977, Hastings (1) had commenced construction of the Academic Facility, abandoned the concept of the plaza, and was holding construction of the Community Legal Affairs Facility in abeyance pending further planning as to design and size; (2) was aware of many tenants' reluctance if not opposition to relocating, and; (3) was being pressed by at least some members of the Community Housing Committee to provide alternative living quarters to the tenants facing eviction and/or relocation.

In any event, Hastings had decided by July of that year to provide alternative housing. To this end, Hastings spent approximately $220,000 converting the building known as the Madonna Hotel located at 270 McAllister Street (which Hastings owned and had been using for faculty office space, as well as renting to commercial tenants)[5] and the adjacent Ramona Apartments for housing. By March of 1978, after Hastings had completed ex-

---

[5]It appears from information developed during discovery that the Madonna had been a residence for elderly women maintained by the Catholic Archdiocese prior to the purchase by Hastings in 1972. These tenants were subsequently relocated. Their eligibility for relocation benefits is not at issue here.

tensive renovations, a total of 90 units—80 at the Madonna and 10 at the Ramona—were available for new tenants. At the suggestion of the Community Housing Committee, these units were first made available to current residents of the Eureka and Philadelphia hotels, who were also offered lifetime rent subsidies so that their rent would never be greater than in these hotels.[6] Approximately 16 tenants accepted this "Special Rental Option." Hastings provided additional assistance in the form of physical aid in moving, and either a moving expenses payment or a combination of moving expenses and dislocation "allowances." According to Albrecht, a total of about 50 current and past tenants eventually resettled in new housing provided by Hastings.

Hastings issued another relocation plan, at least its seventh version, in February or March of 1978. This plan too was apparently deemed inadequate by some members of the Community Housing Committee, who in April of that year formed COFAR and commenced this action by filing a "Complaint for Declaratory and . . . Injunctive Relief." The parties thereafter began negotiations, and in July executed a "Stipulation of Partial Settlement" specifying substantial changes in Hastings relocation plan. The changes were made and Hastings revised relocation plan was issued that same month.[7]

REVIEW

II

Hastings raises a preliminary matter which will be considered before proceeding the merits of its appeal. ■ As previously mentioned, the

---

[6]Hastings's offer of substitute housing in the Madonna and Ramona hotels was communicated to tenants in a series of four letters dated in June and July 1977. Each of the letters emphasized that it was not an eviction notice. Several of the letters also stressed that a tenant would not "have to move if you don't want to" and one advised that in the event of moving "Hastings will still have all of its obligations to you" regarding "payments, assistance and benefits." Tenants were informed in another that "You will keep all your rights whether you move or not. . . . You will not lose any of your rights." At least one of the letters was drafted after consultation with representatives of the Human Rights Commission and SFNLAF. Both of these representatives subsequently became members of COFAR. Don Hesse, the Human Rights Commission representative, was elected as COFAR's first "chairperson" in 1979.

[7]In its final form, Hastings's relocation plan establishes standards of eligibility for benefits, a claims procedure including an appeal mechanism, and an augmented tracing program.

The benefits available to tenants include (1) rental supplements of up to $6,000 disbursed for up to six years; either (2) moving expenses and reimbursement for property lost, stolen, or damaged in the process of moving, or (3) a "Dislocation Allowance" of $300 and a "Moving Expense Allowance" of up to $300; (4) assistance in completing claims forms; (5) advice and assistance in relocating; (6) housing in the Madonna and Ramona hotels, and; (7) the "Special Rental Option" described in the text.

trial court took judicial notice of the Department of Housing and Community Development guidelines, which were also received in evidence. (See fn. 4, *ante.*) Hastings argues that because the guidelines did not become effective until January 1, 1977, they are not retroactively applicable "to the acquisitions here," all of which were completed by 1974.

The general rule that statutes will not be given retroactive operation has been followed from the earliest days of California's statehood (*Von Schmidt v. Huntington* (1850) 1 Cal. 55, 65) to the present. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1968) 65 Cal.2d 349, 371 [55 Cal.Rptr. 23, 420 P.2d 735]; *County of Sacramento* v. *Loeb* (1984) 160 Cal.App.3d 446, 459 [206 Cal.Rptr. 626].) This principle has been applied to the Relocation Assistance Act. (*Albright* v. *State of California* (1979) 101 Cal.App.3d 14, 21 [161 Cal.Rptr. 317]; *Parking Authority* v. *Nicovich* (1973) 32 Cal.App.3d 420, 424-425 [108 Cal.Rptr. 137].) It being the rule that administrative regulations are subject to the same treatment as statutes (see *Forrest* v. *Trustees of Cal. State University & Colleges* (1984) 160 Cal.App.3d 357, 362 [206 Cal.Rptr. 595]; *Geftakys* v. *State Personnel Board* (1982) 138 Cal.App.3d 844, 859 [188 Cal.Rptr. 305]), a comparable disinclination to apply regulations retroactively has also evolved. (See *People ex rel. Deukmejian* v. *CHE, Inc.* (1983) 150 Cal.App.3d 123, 135 [197 Cal.Rptr. 484]; *Georgia-Pacific Corp.* v. *California Coastal Com.* (1982) 132 Cal.App.3d 678, 694 [183 Cal.Rptr. 395]; *La Com* v. *Pacific Gas & Electric Co.* (1955) 132 Cal.App.2d 114, 117 [281 P.2d 894, 48 A.L.R.2d 1455].) Nevertheless, there are several reasons why it would not be inappropriate to apply the 1977 guidelines.

First, Hastings's claim as made here is inconsistent with its past actions. Hastings's final relocation plan, both as originally issued in February/March 1978 and as revised pursuant to the partial settlement, recites that it "supplements" the "Relocation Regulations" of the University of California and Hastings's own "Relocation Assistance Principles." The university regulations declare that they are "adopted from" and "[b]ased upon the . . . Relocation Assistance Law . . . and the Relocation Assistance and Real Property Guidelines, which were dated October 19, 1976 to become effective January 1, 1977." Hastings' "Relocation Assistance Principles" adopt several provisions of the guidelines (e.g., Cal. Admin. Code, tit. 25, §§ 6008, 6034, 6038, 6040), verbatim copies of which are attached, as well as stating that "[r]elocation payments . . . will be provided in accordance with the State Guidelines, Sections 6080 et seq." and that a grievance procedure "will be established . . . pursuant to State Guidelines §§ 6150 et seq." In response to a request for admission propounded by plaintiffs, Hastings responded: "Defendants admit that they have a legal duty to provide comparable replacement housing to eligible persons and that such duty is imposed

in part by 25 California Administrative Code section 6054." Hastings's attorney told the court that "I'll stipulate to your taking judicial notice of the guidelines." Finally, Hastings has cited the later set of guidelines throughout its briefs on this appeal. Hastings's conduct therefore supports the conclusion that Hastings accepted the 1977 guidelines and consequently waived the protection of the general rule against retroactivity. (See Civ. Code, § 3515; *People* v. *Ventura Refining Co.* (1928) 204 Cal. 286, 295 [268 P. 347]; *Outboard Marine Corp.* v. *Superior Court* (1975) 52 Cal.App.3d 30, 41 [124 Cal.Rptr. 852]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 306-307, pp. 316-318; *Western Addition Community Organization* v. *Weaver* (N.D.Cal. 1968) 294 F.Supp. 433, 436-437.)

Second, and as a separate and independent basis for our conclusion, consideration of the 1977 guidelines is compelled by the nature of the action and the relief granted. It must be remembered that plaintiffs sought and were awarded equitable relief in the form of an injunction. "Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court." (*American Fruit Growers* v. *Parker* (1943) 22 Cal.2d 513, 515 [140 P.2d 23]; accord *Hays* v. *Wood* (1979) 25 Cal.3d 772, 782 [160 Cal.Rptr. 102, 603 P.2d 19]; *White* v. *Davis* (1974) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222].) This court recently had occasion to apply this principle, stating: "On an appeal from a judgment granting or denying an injunction, the reviewing court applies the law which is current at the time of review." (*Alternatives for California Women, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 436, 446 [193 Cal.Rptr. 384].) We there relied upon *M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666, 673-674 [177 Cal.Rptr. 690], where this principle prevailed over the general rule against retroactivity.

For each of these reasons, the 1977 guidelines shall be treated as pertinent authority which is applicable to this appeal.

### III

 Hastings first contends that the trial court should not have proceeded to judgment because indispensable parties were not before it. According to Hastings, the parties in whose absence no valid judgment could be made included "every allegedly displaced person who was conceivably entitled to relocation benefits of any kind from Hastings."

Code of Civil Procedure section 389 governs the matter of compulsory joinder of indispensable parties. Subdivision (a) of that statute provides in pertinent part: "A person who is subject to service of process and whose

joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of his claimed interest . . . ."

 Hastings did not raise the matter of defective nonjoinder by way of demurrer or in its answer, which are the usual methods of making a timely and proper objection on this ground. (See *King* v. *King* (1971) 22 Cal.App.3d 319, 325 [99 Cal.Rptr. 200]; *Peerless Ins. Co.* v. *Superior Court* (1970) 6 Cal.App.3d 358, 361 [85 Cal.Rptr. 679].) Hastings did not raise the issue at trial. The consequence of this inaction precludes Hastings from arguing the subject for the first time on appeal: "Where a case has been fully tried without objection to the absence of parties and the claim that the absent parties were indispensable is raised for the first time on appeal, the rule's underlying policy considerations of avoiding piecemeal litigation and multiplicity of suits [citations] are of little consequence inasmuch as the judicial and litigant resources necessary to the litigation have already been expended. . . . The only justification for the rule permitting the issue to be raised for the first time on appeal is that the absence of a party has precluded the trial court from rendering any effective judgment between the parties before it." (*King* v. *King, supra,* 22 Cal.App.3d 319, 326; accord *Martin* v. *Kehl* (1983) 145 Cal.App.3d 228, 242 [193 Cal.Rptr. 312]; *Ferraro* v. *Southern Cal. Gas Co.* (1980) 102 Cal.App.3d 33, 45 [162 Cal.Rptr. 238]; *Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 369 [140 Cal.Rptr. 744].)

This final qualification is not appropriate here. It appeared at trial Hastings knew of the whereabouts of a substantial number of displaced tenants but consciously chose not to treat them as indispensable parties. Within the meaning of Code of Civil Procedure section 389, the absence of the tenants did not prevent "complete relief" being accorded to "those already parties." In addition, given Hastings's professed willingness to give all benefits (except comparable replacement housing, the major objective of plaintiffs) to the former tenants, the tenants' rights to such would not be impaired or impeded, nor was Hastings threatened with "a substantial risk of incurring double, multiple, or other inconsistent obligations."

In short, the absent tenants may be deemed proper or even necessary parties, but they are not indispensable. Their absence did not disable the

trial court from acting. ■ As this court has previously stated, "the failure to join an 'indispensable' party is not 'a jurisdictional defect' in the fundamental sense; even in the absence of an 'indispensable' party, the court still has the power to render a decision as to the parties before it which will stand. [Citations.] It is for reasons of equity and convenience, and not because it is without the power to proceed, that the court should not proceed with a case where it determines that an 'indispensable party' is absent and cannot be joined." (*Kraus* v. *Willow Park Public Golf Course, supra,* 73 Cal.App.3d 354, 364; accord *Strauss* v. *Summerhays* (1984) 157 Cal.App.3d 806, 814 [204 Cal.Rptr. 227]; *Halper* v. *Froula* (1983) 148 Cal.App.3d 1000, 1006 [196 Cal.Rptr. 727]; *Martin* v. *Kehl, supra,* 145 Cal.App.3d 228, 242.) Accordingly, the error claimed by Hastings is neither cognizable nor sustainable on this appeal.

## IV

■ Hastings next contends that no judgment ought to have been made because plaintiffs lack standing to press the claim that Hastings was obligated to provide replacement housing. This too is a matter not presented by Hastings in the trial court, but it is an issue which may be raised for the first time on appeal: "It is elementary that a plaintiff who lacks standing cannot state a valid cause of action; therefore, a contention based on a plaintiff's lack of standing cannot be waived under Code of Civil Procedure section 430.80 and may be raised at any time in the proceeding." (*McKinny* v. *Board of Trustees* (1982) 31 Cal.3d 79, 90 [181 Cal.Rptr. 549, 642 P.2d 460]; accord *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 619 [156 Cal.Rptr. 718, 596 P.2d 1134]; *Sherwyn* v. *Department of Social Services* (1985) 173 Cal.App.3d 52, 58 [218 Cal.Rptr. 778].) We consequently examine Hastings's contention with regard to each of the plaintiffs.

■ Plaintiff Richard McKeon did not appear at the trial. He is identified in the complaint as follows: "Plaintiff Richard McKeon lived in the Eureka Hotel . . . from November 1976 to March 1977, when he moved because of defendants' acquisition of the property and their well publicized plans to demolish the hotel to make way for the law center." Hastings admitted this allegation in its answer, but it denied that McKeon was entitled to relocation benefits as plaintiffs alleged. McKeon therefore qualified as a "displaced person," defined in the Relocation Assistance Act as "any person who moves from real property, or who moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, by a public entity."[8] (Gov. Code, § 7260, subd. (c).)

---

[8]The act defines the term "public entity" to include "the State, the Regents of the University of California, a county, city, city and county, district, public authority, public agency, and

Plaintiff Avery Montgomery likewise did not appear at the trial. In its answer Hastings also admitted the truth of the allegations of the complaint which identified him as follows: "Plaintiff Avery Montgomery was a resident of the Philadelphia Hotel . . . from 1976 until March 1978, when he was evicted by Hastings, which had acquired the property for its planned law center, for non-payment of rent" but Hastings denied that Montgomery thereby "suffer[ed] a forfeiture of relocation benefits." Ordinarily, Montgomery's eviction for failing to pay rent would divest him of his status as a displaced person. (See *Baiza* v. *Southgate Recreation & Park Dist.* (1976) 59 Cal.App.3d 669, 674 [130 Cal.Rptr. 836].) It appears, however, that Hastings waived this defect by expressly agreeing in the "Stipulation of Partial Settlement" that "eviction of an otherwise eligible tenant from property owned by Hastings shall not disqualify said tenant from receiving relocation benefits. Plaintiff Montgomery agrees that the amount of the judgment obtained by Hastings against him may be offset from [*sic:* by] benefits."

It therefore appears that McKeon and Montgomery were "displaced persons" within the meaning of the Relocation Assistance Act and presumptively eligible for benefits pursuant thereto. (See Cal. Admin. Code, tit. 25, § 6034, 57 Ops.Cal.Atty.Gen. 71, 72 (1974).) Each alleged a specific loss of such benefits by reason of past or prospective actions by Hastings, thereby asserting a judicially cognizable and remediable claim for redress. Each had standing. (Cf. *Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796-797 [166 Cal.Rptr. 844, 614 P.2d 276]; *Horn* v. *County of Ventura, supra,* 24 Cal.3d 605 at pp. 619-620; *Gladstone, Realtors* v. *Village of Bellwood* (1979) 441 U.S. 91, 100 [60 L.Ed.2d 66, 77, 99 S.Ct. 1601].)

Hastings argues that both McKeon and Montgomery had secured new habitations and also failed to "present any evidence that they are entitled to any form of replacement housing." As to the issue of standing this argument fails on two grounds. First, it defies reason and fair play to claim that a displaced person's right to relocation benefits including substitute housing is in any fashion dependent upon remaining homeless.[9] It would be a most harsh penalty for asserting statutory rights, and is at odds with the legislative intent of the Relocation Assistance Act. (Cf. *Albright* v. *State of California, supra,* 101 Cal.App.3d 14, 19-21.) Second, the concept of

---

any other political subdivision or public corporation in the State when acquiring real property, or any interest therein, in any city or county for public use."

It is undisputed that Hastings, which is affiliated with the University of California (Ed. Code, § 92201) and has always been so since its inception (see Stats. 1878, ch. 351, § 2, p. 533), qualifies as a "public entity" for purposes of the Relocation Assistance Act.

[9] A proposition best evidenced by the fact that Hastings allowed a number of former tenants located during the tracing program to move back into Hastings-owned buildings.

standing focuses upon the party and not the specific form or type of relief which may ultimately be awarded. (See *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [101 Cal.Rptr. 880, 496 P.2d 1248]; *Zee Toys, Inc.* v. *County of Los Angeles* (1978) 85 Cal.App.3d 763, 780 [149 Cal.Rptr. 750]; *Valley Forge College* v. *Americans United* (1982) 454 U.S. 464, 484 [70 L.Ed.2d 700, 717, 102 S.Ct. 752]; *O'Hair* v. *White* (5th Cir. 1982) 675 F.2d 680, 685-686.)

Because it has already been determined that McKeon and Montgomery have standing, it is not strictly necessary to determine whether COFAR has a similar status. (See *Secretary of Interior* v. *California* (1984) 464 U.S. 312, 319, fn. 3 [78 L.Ed.2d 496, 503, 104 S.Ct. 656]; *Watt* v. *Energy Action Educational Foundation* (1981) 454 U.S. 151, 160 [70 L.Ed.2d 309, 317, 102 S.Ct. 205].) Nevertheless, in the interest of completeness, the question of COFAR's standing will also be examined.

█ COFAR is alleged in the complaint to be "an unincorporated association of individuals and agencies who: (1) represent low income persons . . . who have housing problems; or (2) are actively working on issues or projects involving the availability of housing for low income people. Most of the COFAR members are members of the Community Housing Committee convened [by Hastings] pursuant to state relocation guidelines. . . . COFAR is beneficially interested in assuring that all persons displaced by defendants' acquisition of residential property for the law center receive all the benefits and assistance guaranteed under the applicable law."[10] In an answer to an interrogatory propounded by Hastings, COFAR identified Joseph Harrington, Walter Paea, Earl Ulsh, and Michael Shelburn as among its members. This answer was received in evidence, as was a ledger offered by Hastings which showed that each of these persons had been a tenant at the Eureka Hotel for varying lengths of time between "1/11/74" and "2/3/77." With the exception of Ulsh, all (in addition to "Montgomery") appeared on Hastings' "Tenant Survey for Budget" as apparently qualifying for relocation assistance.

The participation of incorporated and unincorporated associations such as COFAR has become common and accepted in public interest-oriented

---

[10]From these and other allegations (e.g., Hastings "causing great and irreparable injury to plaintiffs and the community of low income persons plaintiffs represent") it cannot be ascertained with assurance whether COFAR purports to act as the virtual representative of all persons who were displaced by Hastings. (Cf. *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 268 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Parker* v. *Bowron* (1953) 40 Cal.2d 344, 347, 351-359 [254 P.2d 6].) In light of our conclusion that COFAR has standing to press the claims of its members who qualified as displaced persons, we need not reach this issue. Parenthetically, we note that plaintiffs did not prosecute this action as either a class action (Code Civ. Proc., § 382) or a taxpayer's suit (Code Civ. Proc., § 526a).

litigation and activities. (See *United Transportation Union* v. *Michigan Bar* (1971) 401 U.S. 576, 585 [28 L.Ed.2d 339, 347, 91 S.Ct. 1076]; *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 428 [9 L.Ed.2d 405, 415, 83 S.Ct. 328]; *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 458-460 [2 L.Ed.2d 1488, 1497-1498, 78 S.Ct. 1163]; *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 465, fn. 3 [156 Cal.Rptr. 14, 595 P.2d 592]; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 737, fn. 6 [97 Cal.Rptr. 385, 488 P.2d 953]; *Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 874, fn. 12 [196 Cal.Rptr. 69]; cf. *Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523].) Of late courts have noted a "marked accommodation of formerly strict procedural requirements of standing . . . where matters relating to the 'social and economic realities of the present-day organizations of society' . . . are concerned" and a corresponding "relaxation of former, more rigid standing requirements in order to permit an assertion of a 'public' cause of action." (*Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 122-123 [109 Cal.Rptr. 724]; accord *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 793-794 [171 Cal.Rptr. 334]; *Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520, 533 [170 Cal.Rptr. 724]; see Comment, *Judicial Review of Displacee Relocation in Urban Renewal* (1968) 77 Yale L.J. 966; Comment, *Protecting the Standing of Renewal Site Families to Seek Review of Community Relocation Planning* (1964) 73 Yale L.J. 1080.) The need for housing clearly qualifies as one of the most basic "social and economic realities of the present-day organization of society" and has been recognized as such. (See *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.*, supra, at p. 794; *Stocks* v. *City of Irvine*, supra.) As this court noted in a slightly different context; "Respondents are thus pursuing more than privately held rights, and are asserting more than privately held grievances: they are acting as members of the public and in the public interest." (*Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 114 [122 Cal.Rptr. 282].)

We therefore conclude, on the basis of the record and for purposes of this appeal, that Hastings's contention regarding plaintiffs' lack of standing cannot be sustained.

## V

We now turn to the heart of this appeal—the trial court's determination that Hastings must provide 375 units of "comparable replacement housing." Resolution of Hastings's contentions attacking this determination requires a particularized examination of the trial court's reasoning as evidenced in its

detailed 15-page statement of decision requested by the parties pursuant to Code of Civil Procedure section 632.

The figure of 375 units was reached as follows: During the period from the "applicable eligibility date" on which each of the five buildings was acquired by Hastings to October 21, 1977, the date on which Hastings by letter formally notified the tenants of the buildings' acquisition, at least 821 people moved from these properties. Next, because at least 60 percent of the former tenants located during the tracing program "were determined by Hastings itself to have moved as a result of the acquisition," this figure was reduced by half, leaving 410 "displaced persons." Only 35 of the 90 units at the Madonna and Ramona hotels were found to qualify as comparable replacement housing. After this figure was subtracted from the number of displaced persons, the trial court concluded that Hastings was obligated to provide 375 additional units of comparable replacement housing.

The centerpiece of Hastings's appeal is its sustained and multipronged assault upon this conclusion as both legally unsound and factually unsupported. Before we take up Hastings's contentions, it is helpful to examine the concept of comparable replacement housing, which is the most dramatic form of aid provided to displaced persons.

The Relocation Assistance Act embodies a hierarchy of benefits relating to substitute housing. At bottom is the requirement of Government Code section 7261, subdivision (a), that a public entity must provide "relocation advisory assistance." This assistance must include "[a]ssuring that, within a reasonable period of time, prior to displacement, . . . there will be available in areas not generally less desirable . . . and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, equal in number to the number of . . . such displaced persons." (*Id.*, subd. (c)(3).) The displaced person is also entitled to be compensated for moving and dislocation expenses. (Gov. Code, § 7262.) Displaced homeowners are to be paid up to $15,000 (Gov. Code, § 7263), displaced renters up to $4,000. (Gov. Code, § 7264.)

The concept of comparable replacement housing is introduced by Government Code section 7264.5, which provides in pertinent part: "(a) If comparable replacement housing is not available and the public entity determines that comparable replacement housing cannot be otherwise made available, the public entity shall use funds authorized for the project for which the real property . . . is being acquired to provide that housing. [¶] (b) No person shall be required to move from his dwelling because of its acquisition by a public entity, unless there is replacement housing, as described in paragraph (3) of subdivision (c) of Section 7261, available to him. . . ."

This statutory directive is supplemented by one of the 1977 guidelines. *"Last Resort Housing.* (a) No eligible person shall be required to move from his dwelling because of the action of a public entity unless comparable replacement housing is available to him. [¶] (b) If on the basis of its survey and analysis of relocation needs and resources a public entity cannot determine that comparable replacement housing will be available as required, the public entity may not proceed with any phase of a project or other activity which will result in displacement unless it provides such housing. . . . [¶] (c) If the action of a public entity has resulted or is resulting in displacement and comparable replacement housing is not available as needed, the public entity shall use its funds, or funds authorized for the project to provide such housing, or shall terminate or suspend further implementation of the project activity. . . ." (Cal. Admin. Code, tit. 25, § 6054 [original italics].)[11]

### A

The primary component of Hastings's legal challenge to the trial court's conclusion is the argument that the obligation to provide replacement housing does not apply to persons who voluntarily move from property acquired by a public entity. Hastings asserts that, as a matter of statutory construction, Government Code section 7264.5 and California Administrative Code, title 25, section 6054, were applied by the trial court in such a way as to produce an absurd result. Certainly construction of either a statute or a regulation should avoid such a consequence. (See *Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272]; *People* v. *Burroughs* (1984) 35 Cal.3d 824, 836, fn. 10 [201 Cal.Rptr. 319, 678 P.2d 894].) The circumstances of this case do not compel us to consider whether this eventuality occurred.

The essential aspect of Hastings's argument, which does not appear to have previously decided, is one of eligibility—Does someone who voluntarily leaves premises acquired by a public entity qualify as a displaced person within the meaning of the Relocation Assistance Act? As we have seen in part II, *ante,* one of the 1977 guidelines provisions adopted by Hastings in its "Relocation Assistance Principles" is California Administrative Code, title 25, section 6034. Entitled "Eligibility," that section reads in pertinent part: "(a) Relocation assistance and benefits shall be available to: . . . (3) Any person who moves from real property as a result of its acquisition by a public entity *whether the move is voluntary or involuntary."* (Italics added.)

---

[11]Section 2.2 of the 1973 guidelines provided in pertinent part: *"Housing provided as a last resort.* When it is determined that adequate replacement housing is not available and cannot otherwise be made available, the head of the public entity *may* take action to develop replacement housing. . . ." (First italics in original, second italics added.)

Hastings has repeatedly stressed that it never evicted any tenants except for nonpayment of rent. Yet it is clear that a substantial number of former tenants, who presumably left voluntarily, were given benefits by Hastings after they had been located by the tracing program. Hastings's present argument is thus at odds with its prior course of action accepting voluntarily displaced former tenants as eligible for relocation benefits. (Cf. *Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 752-754 [8 Cal.Rptr. 427, 356 P.2d 171]; *Lix* v. *Edwards* (1978) 82 Cal.App.3d 573, 579-581 [147 Cal.Rptr. 294].) For this reason, and for the reasons discussed in part II, *ante,* we deem it prudent not to reach the merits of Hastings' contention regarding whether the correct construction of Government Code section 7264.5 and California Administrative Code, title 25, section 6054 excludes voluntarily displaced persons. (Cf. *Ashwander* v. *Valley Authority* (1936) 297 U.S. 288, 347 [80 L.Ed. 688, 711, 56 S.Ct. 466] (conc. opn. of Brandeis, J.).)

B

Hastings's next argument is compelling in its simplicity—plaintiffs failed to prove their entitlement to comparable replacement housing. This part of Hastings's contention we decide on its merits and sustain.

 The Relocation Assistance Act is to be construed as a whole. (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352]; *Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217]; *County of Los Angeles* v. *Surety Ins. Co.* (1984) 162 Cal.App.3d 58, 62 [208 Cal.Rptr. 263].) Viewed from this perspective, it is clear that relocation benefits, particularly replacement housing, do not accrue to the general public. Government Code section 7261 requires a public entity to assure that "there will be available . . . decent, safe, and sanitary dwellings[] *equal in number to the number of . . . displaced persons who require such dwellings*" and that such dwellings will be available "at rents or prices within the financial means *of the families and individuals displaced.*" (Italics added.) Both Government Code section 7264.5 and California Administrative Code, title 25, section 6054 continue in this vein, prohibiting a public entity from displacing a person unless there is replacement housing "available *to him.*" (Italics added.) It is from the perspective of providing replacement housing to identifiable displaced persons that section 6054 addresses itself to requiring that such housing "will be available *as required*" (italics added) by given individuals.

 As previously mentioned, neither McKeon nor Montgomery testified at the trial. Neither made any showing that he required alternative housing or that he would move to such accommodations if provided by

Hastings. (Cf. *Carson* v. *Pierce* (8th Cir. 1983) 719 F.2d 931, 933.) The same is true for each of the former tenant members of COFAR. Therefore, none of the individual plaintiffs have brought themselves within the last resort housing provisions of the Relocation Assistance Act and its supporting guidelines. It follows that plaintiffs have not shown a personal need for 375 units of replacement housing. An examination of the record reinforces this conclusion and discloses fundamental defects in the trial court's reasoning.

Reference has already been made to the ledger of the Eureka hotel which was received in evidence at the trial. (See part IV, *ante.*) The ledger consists of approximately 50 pages of handwritten entries dating from June 21, 1972 through April 1, 1977. The name of each tenant (with some exceptions, such as "3 Austrians"), together with dates showing the length of their residency, is separately listed. Most of the approximately 580 entries are accompanied by comments describing the tenant and reasons for departure (i.e., "evicted in 2 days—lunatic alcoholic—violent"). Although often illegible at points, the ledger constitutes the best and most comprehensive evidence regarding the tenants and tenancies at this establishment. Its importance warrants detailed analysis.

Approximately 10 to 15 tenants are noted as "evicted." About twice as many were recorded as "skipped," "disappeared," or "absconded." Five persons are listed as "deceased" or "found dead." It appears that fights, calls to police, resulting arrests, and hospitalizations were common. The shortest stay shown is "4 hrs." Approximately 75 entries are for overnight stays. About 170 tenancies were for one week or less. An additional 120 or so were for a month or less. Approximately 75 entries evidence persons who stayed for two months or less. Because these categories are not overlapping, it thus appears that about 440 of the 580 entries, or 75 percent, pertain to stays of two months or less. There are, however, 20 persons who remained for a year or more, the longest recorded stay being three years and seven months.

As may be gathered from a hotel with 53 rooms (see text accompanying fn. 3, *ante*) which had at least 580 registrations, turnover at the Eureka was brisk.[12] Approximately 55 persons stayed there twice. Twenty are listed for three different times. Five are recorded as four-time repeat tenants. One person has five entries, one has six, and one has eight.

---

[12] One of plaintiffs' witnesses testified at trial that "a large number" of the Eureka's tenants were merchant seamen who tended to move fairly frequently. Ms. Albrecht corroborated this testimony and further testified that the hotel attracted "some transient types . . . who were just picking up work for a little while and moving on."

The Eureka contributed 500 of the 821 persons who moved from the properties acquired by Hastings. However much this figure was subsequently reduced by the trial court, the number of Eureka tenants figuring in the court's determination of displaced persons had to exceed 53, the number of rooms at the hotel. As such, the court's computations had to be based in part on the rapid turnover of the hotel's tenants for any period in excess of 24 hours. Turnover is a distortive and unreliable factor, whose use has been repudiated within the context of the federal housing acts. (See *"TOOR"* v. *United States Dept. of "HUD"*[13] (N.D.Cal. 1973) 406 F.Supp. 1024, 1034-1035; cf. *Western Addition Community Organization* v. *Weaver, supra,* 294 F.Supp. 433 at p. 439, where the court noted the "questionable reliability of the technique.") The danger of employing turnover as an element of the court's computations can be demonstrated with the Eureka ledger.

Put to one side the fact that the overwhelming majority of the Eureka's residents were short-term occupants, probably uninterested in establishing a more stable domicile in the hotel. Consider only the three persons who stayed at the Eureka on five, six, and eight separate occasions. According to the trial court's reasoning, these three individuals account for nineteen moves, therefore there are nineteen displaced persons, thus requiring nineteen units of replacement housing.

The trial court reduced the figure of 831 moved persons by half on the theory that at least 60 percent of the former tenants traced "were determined by Hastings itself to have moved as a result of the acquisition[s]," thereby producing 410 displaced persons for whom Hastings had to provide replacement housing. Whatever the abstract value of this formulation, it is not proof derived from admissible evidence. "No rule is better settled that the one '[m]ere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'" (*People* v. *Terry* (1962) 57 Cal.2d 538, 566 [21 Cal.Rptr. 185, 370 P.2d 985]; accord *People* v. *Anderson* (1968) 70 Cal.2d 15, 24 [73 Cal.Rptr. 550, 447 P.2d 942].) Mathematical formulae cannot be manipulated to substitute for hard evidence. (Cf. *People* v. *Collins* (1968) 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 46 A.L.R.3d 1176].)

The judgment requires Hastings to provide 375 housing units, which, taking no account of the condition of the units in the Madonna and Ramona hotels,[14] is more than twice the number of rooms acquired by Hastings.

---

[13]"TOOR" is an acronym for Tenants and Owners in Opposition to Redevelopment, which is a member of COFAR.

[14]Hastings's revised relocation plan notes that "The Madonna Hotel and many units in the Ramona were not occupied and were not suitable for residential purposes when acquired by Hastings." (Cf. fn. 5, *ante.*)

Plaintiffs did not prove that they either needed or would occupy replacement housing. They likewise did not prove that any actually displaced former tenants wanted, needed, would occupy, or were even likely to occupy, any of the 375 replacement units. Obviously, the judgment would consequently benefit nonparties in the form of the public at large.[15] This is not a valid basis for the judgment (see *Fazzi v. Peters* (1968) 68 Cal.2d 590, 594 [68 Cal.Rptr. 170, 440 P.2d 242]; *Fifth & Broadway Partnership v. Kimny, Inc.* (1980) 102 Cal.App.3d 195, 199 [162 Cal.Rptr. 271, 7 A.L.R.4th 580]) nor is it consistent with the purpose of the Relocation Assistance Act, which calibrates and conditions the provision (1) of benefits in general upon "a 'causal connection between the acquisition [by the public entity] and the displacement . . .'" (*Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency* (1986) 178 Cal.App.3d 435, 444 [223 Cal.Rptr. 728] [citing and quoting *Stephens v. Perry* (1982) 134 Cal.App.3d 748, 755 [184 Cal.Rptr. 701]]) and (2) of replacement housing in particular upon demonstrated personalized need. (See Gov. Code, §§ 7261, 7264.5; Cal. Admin. Code, tit. 25, § 6054.) ▉ There is no doubt that government can limit the beneficiaries of its largesse, so long as it does not do so on an impermissible basis. (See *Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 573, 75 S.Ct. 461]; *In re Ricky H.* (1970) 2 Cal.3d 513, 521-522 [86 Cal.Rptr. 76, 468 P.2d 204]; *County of San Diego v. Morrison* (1984) 153 Cal.App.3d 233, 240 [200 Cal.Rptr. 187]; *Kalaydjian v. City of Los Angeles* (1983) 149 Cal.App.3d 690, 694 [197 Cal.Rptr. 149].) This principle applies to state and federal housing acts. (See *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 591 [131 Cal.Rptr. 361, 551 P.2d 1193]; *The Housing Authority v. Dockweiler* (1939) 14 Cal.2d 437, 460-461 [94 P.2d 794]; *Highland Plastics, Inc. v. Enders* (1980) 109 Cal.App.3d Supp. 1, 13 [167 Cal.Rptr. 353]; *Alexander v. U.S. Dept. of HUD* (1979) 441 U.S. 39, 59-62 [60 L.Ed.2d 28, 43-45, 99 S.Ct. 1572].)

▉ Plaintiffs had the burden of proving Hastings' noncompliance with the Relocation Assistance Act and their entitlement to the form of relief sought. (Evid. Code, §§ 500, 550; *Heesy v. Vaughn* (1948) 31 Cal.2d 701, 709 [192 P.2d 753]; *Fillmore v. Irvine* (1983) 146 Cal.App.3d 649, 660-661 [194 Cal.Rptr. 319]; *Smith v. Circle P Ranch Co.* (1978) 87

---

[15]Such unintended beneficiaries create substantial problems. For example, on what basis would Hastings decide who would occupy the housing? If former displaced persons occupied them, Hastings' duty to maintain them would presumably end if the persons died, moved, or otherwise renounced their occupancy rights. (Cf. 57 Ops.Cal.Atty.Gen., *supra*, 70 at p. 72.) But if the general public occupied the replacement housing, could Hastings' obligations be similarly ended? Would Hastings be obligated to construct and maintain housing or would merely paying for tenants live in housing owned by others suffice? If the former, would Hastings have to maintain the housing in perpetuity, thus putting a law school into the public housing business forever? We mention these possible problems to illustrate the types of issues this approach would introduce.

Cal.App.3d 267, 274 [150 Cal.Rptr. 828].) The preceding discussion has shown that they failed completely to do so, thus requiring reversal of a judgment unsupported by evidence. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Malibu Water Co.* v. *MacGregor* (1963) 215 Cal.App.2d 351, 355 [30 Cal.Rptr. 310].)

## VI

The parties argue numerous other contentions in their lengthy and able briefs. Consideration of these other points is not essential to our determination of the controversy before us. Accordingly, with one exception, we do not reach them.

The only remaining argument which we do take up is made by plaintiffs, who challenge a ruling by the trial court in order to demonstrate that Hastings was not prejudiced by the failure of proof discussed in part VB of this opinion. Although plaintiffs did not appeal from the judgment, review of their contention is appropriate in these circumstances. (Code Civ. Proc., § 906; *Mott* v. *Horstmann* (1950) 36 Cal.2d 388, 393 [224 P.2d 11]; *Lucas* v. *County of Monterey* (1977) 65 Cal.App.3d 947, 951-952 [135 Cal.Rptr. 707].)

At the start of the trial plaintiffs moved the court for an order requiring Hastings to bear the burden of proving "what caused each of the 821 [displaced] persons to move from the properties." The motion was made on the ground that because Hastings neglected to perform its "legal duties to survey and to analyze the housing needs of displaced persons" as plaintiffs claimed was required by Government Code, section 7261, subdivision (c), the trial court should shift the burden of proof in accordance with *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465]. The court heard extensive argument and twice denied the motion, first at the commencement of plaintiffs' case-in-chief and again at its close.

*Haft* involved an action for the wrongful death of two persons in a motel swimming pool. No witnesses observed the drownings. The motel had failed to comply with numerous mandatory statutory and regulatory safety requirements, the most important of which was the failure either to provide a lifeguard or to post a warning that no lifeguard service was provided. The Supreme Court, after first holding that "the numerous . . . safety violations established defendants' negligence as a matter of law" (3 Cal.3d 756 at p. 765), then considered whether the "evidentiary void" as to the issue of causation resulting from these violations warranted shifting the burden of proof to the defendants. The court concluded that it did: "Al-

though the paucity of evidence on causation is normally one of the burdens that must be shouldered by a plaintiff in proving his case, . . . . the shift of the burden of proof in the instant case may be said to rest on a policy judgment that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury." (*Id.,* at pp. 771-774 [text and fn. 19, original italics].)

We believe that the trial court was correct in not applying *Haft* to Hastings. The *Haft* shift is applied in tort actions, particularly those involving strict liability for defective products. (See, e.g., *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 121 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]; *Harris* v. *Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373, 378 [113 Cal.Rptr. 489, 521 P.2d 481]; *Stone* v. *Foster* (1980) 106 Cal.App.3d 334, 348 [164 Cal.Rptr. 901]; cf. *Summers* v. *Tice* (1948) 33 Cal.2d 80, 86 [199 P.2d 1, 5 A.L.R.2d 91]; *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 492 [154 P.2d 687, 162 A.L.R. 1258].) So far as can be determined, it has never been applied to a public entity of quasi-governmental dimension. (But see *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34, 64 [132 Cal.Rptr. 680, 553 P.2d 1152], aff'd in part and rev'd. in part *sub nom. University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733].) This case does involve a public entity, but no claim that it committed any tort.

Next, the nature and extent of Hastings' "negligence"—if that term is appropriate—does not strongly favor plaintiffs. The statute relied upon by plaintiffs does not by its express language require a public entity to conduct a tenant survey, although such a requirement may be reasonably inferred.[16] Such a survey is required by both the 1973 and the 1977 guidelines (see Cal. Admin. Code, tit. 25, §§ 6048, 6050, 6122), and Hastings can fairly be charged with failing to conduct a survey. Hastings can also be faulted for limiting the scope of the survey eventually undertaken to the Eureka and Philadelphia hotels, and for not completing it once commenced, al-

---

[16]Government Code section 7260, which mandates a public entity to provide "relocation advisory assistance" to displaced persons, such assistance to include (among other things) determining "the need, if any, of displaced persons"; providing "current and continuing information on the availability, prices, and rentals of comparable decent, safe, and sanitary housing for displaced persons"; assuring such housing; supplying information about assistance from other federal and state assistance programs, and; coordinating the "relocation assistance program with the project work necessitating the displacement and with other planned or proposed activities of other public entities." (Gov. Code, § 7261, subds. (c) and (d).)

though the negative effect is considerably diminished by the fact that the survey was halted at the express request of members of the Community Housing Committee who later helped form COFAR. Nevertheless, the trial court could conclude that Hastings' conduct was far less egregious than that of the defendants in *Haft*.

Finally, the survey would lack the irreplaceable importance required by *Haft*. We have seen from the ledger of the Eureka hotel (covering 500 of the 821 total of former tenants) that a large percentage of residents of that building were transient and unstable. In light of the immediate proximity of the other buildings, it may be assumed that tenancy characteristics of the Eureka were representative of all the buildings acquired by Hastings. If so, Hastings' failure to conduct an exhaustive survey would not create an "evidentiary void" pertinent to the issue of causation identified by plaintiffs: A survey might reasonably show which tenants moved but it would not show *why* they moved.

It therefore appears from an examination of the entire record that the absence of evidence of causation was (1) attributable in approximately equal measure to Hastings and plaintiffs; (2) not a direct and foreseeable result of Hastings's failure to survey, and; (3) not linked to a substantial probability that this omission resulted in or contributed to the harm allegedly suffered. The trial court was therefore fully warranted in denying plaintiffs' motion to shift the burden of proof. (See *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 601 [163 Cal.Rptr. 132, 607 P.2d 924] [text and fn. 14]; *Haft* v. *Lone Palm Hotel, supra,* 3 Cal.3d 756, 771-774 [text and fn. 19]; *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 404-406 [209 Cal.Rptr. 456]; *Smith* v. *Americania Motor Lodge* (1974) 39 Cal.App.3d 1, 5-7 [113 Cal.Rptr. 771, 88 A.L.R.3d 1188].) This leaves intact our previous conclusion that plaintiffs' failure of proof was so fundamental and pervasive that it must be deemed prejudicial.

The judgment is reversed.

Poché, Acting P. J., and Channell, J., concurred.

A petition for a rehearing was denied October 20, 1986, and respondents' petition for review by the Supreme Court was denied December 3, 1986. Bird, C. J., was of the opinion that the petition should be granted.