[No. G038537. Fourth Dist., Div. Three. Nov. 3, 2008.]

ROBERT EKSTROM et al., Plaintiffs and Respondents, v.
MARQUESA AT MONARCH BEACH HOMEOWNERS ASSOCIATION,
Defendant and Appellant.

## COUNSEL

Kulik, Gottesman, Mouton & Siegel, Thomas M. Ware II, Sharon Barber; Borton, Petrini & Conron and Matthew J. Trostler for Defendant and Appellant.

Enterprise Counsel Group, David A. Robinson, Benjamin P. Pugh; and Jeffrey Lewis for Plaintiffs and Respondents.

## OPINION

**O'LEARY, J.**—Marquesa at Monarch Beach (Marquesa) is a common interest development governed by the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.). It is comprised of single-family homes in the Monarch Beach development of Dana Point, many of which have ocean and golf course views. The community is managed by the Marquesa at Monarch Beach Homeowners Association (the Association), which is governed by a board of directors (the Board), and is subject to a recorded declaration of conditions, covenants, and restrictions (CC&R's).

Plaintiffs are individual homeowners within Marquesa whose views have been blocked by many palm trees in the development (some planted by the original developer, and some planted by homeowners), which have grown to heights exceeding the height of rooftops.[1] Because trimming a palm tree would effectively require its removal, the Association has taken the position over the

---

[1] The plaintiffs and respondents are Robert and Margaret Ekstrom, James and Shendel Haimes, Michael and Betty Sue Hopkins, Robert and Leona Kampling, Stephen and Cheryl Kron, Jim O'Neil, G. John and Joanne Schoeffel, and Nicholas Shubin. For convenience, they will hereafter be referred to collectively as Plaintiffs, unless the context indicates otherwise. In their respondents' brief, Plaintiffs inform us that while this appeal was pending, Robert Kampling passed away. His estate was not substituted in. Additionally, Jim O'Neil and Michael and Betty Sue Hopkins no longer reside in Marquesa, although they have not been dismissed from this action.

years that the CC&R's express requirement "[a]ll trees" on a lot be trimmed so as to not exceed the roof of the house on the lot, unless the tree does not obstruct views from other lots, does not apply to palm trees. Accordingly, it denied Plaintiffs' demands that it enforce the CC&R's and require offending palm trees be trimmed, topped, or removed.

The trial court granted Plaintiffs' request for declaratory relief and mandamus to compel the Association to enforce its CC&R's. The Association appeals contending (1) the business judgment rule precludes judicial intervention in this matter; (2) the judgment is overbroad and void for vagueness; and (3) the judgment is void because Plaintiffs did not join as defendants the individual homeowners whose trees might be affected by the judgment. We reject the contentions and affirm the judgment.

## FACTS AND PROCEDURE

*CC&R's*

The Marquesa CC&R's, recorded in 1989, provide for approval of all exterior improvements by the Association's Architectural Review Committee (ARC). Section 7.13 of the CC&R's requires the owner of each lot to submit an exterior landscaping plan to the ARC for approval and "[e]ach Owner shall properly maintain and periodically replace when necessary all trees, plants, grass, vegetation and other landscaping improvements located on the Owner's lot. . . . If any Owner fails to install or maintain landscaping in conformance with architectural rules . . . the [ARC] . . . shall have the right either to seek any remedies at law or in equity which it may have or to correct such condition and to enter upon such Owner's property for the purpose of doing so, and such Owner shall promptly reimburse the [ARC] for the cost thereof . . . ."

Section 7.10 of the CC&R's provides: "View Impairment. Each Owner, by accepting a deed to a Lot, acknowledges that grading of, construction on or installation of improvements on other property within [the development] and surrounding real property may impair the view of such Owner, and consents to such impairment."

Section 7.18 of the CC&R's, pertaining to plantings, provides: "Trees. All trees, hedges and other plant materials shall be trimmed by the Owner of the Lot upon which they are located so that they shall not exceed the height of the house on the Lot; provided, however, that where trees do not obstruct the view from any of the other Lots in the Properties, which determination shall be within the sole judgment of the [ARC], they shall not be required to be so

trimmed. Before planting any trees, the proposed location of such trees shall be approved in writing by the [ARC] which approval shall consider the effect on views from other lots."

Section 13.1 of the CC&R's, regarding their enforcement, provides: "The Association, Declarant and any Owner shall have the right to enforce, by any proceedings at law or in equity, all restrictions, conditions, covenants and reservations now or hereafter imposed by the [CC&R's]. Failure by the Association, Declarant or any Owner to enforce any covenants or restrictions contained in the [CC&R's] shall [*not*] be deemed a waiver of the right to do so thereafter."[2]

*Plaintiffs Buy View Homes*

When each of the Plaintiffs purchased their homes in Marquesa, their homes had ocean and/or golf course views for which they paid a premium. Many of those views are now blocked by palm trees, which have been allowed to grow far above the height of the houses on the lots on which they are situated.

Plaintiff John Schoeffel testified that when he moved into his house in 1997, he had a full ocean view that was not blocked by any trees. By 2002, he noticed palm trees growing into his view and by the time of trial, his home's view was about 40 percent blocked by 15 to 20 palm trees.

When Plaintiff Robert Ekstrom bought his home in 1999, it had a full ocean view. At that time, no palm trees in the community exceeded the height of the rooftops. Ekstrom's downhill neighbor, Davis Christakes—a member of the Board—had about 20 palm trees growing on his property. Ekstrom reviewed the CC&R's before his purchase and was satisfied section 7.18 would require Christakes's trees be trimmed or removed if they grew above the roofline and blocked Ekstrom's view.

Plaintiff Steve Kron bought his house with a full ocean view in 2001. Concerned that palm trees might grow to interfere with that view, Kron

---

[2] As written, section 13.1 omitted the word "not," which we have italicized above, reading, "Failure . . . to enforce any of the [CC&R's] shall be deemed a waiver of the right to do so thereafter." Plaintiffs introduced deposition testimony of the original drafter of the CC&R's (now Justice Alex McDonald), that this was a typographical error, and the sentence should read "shall not be deemed a waiver" as was his practice in all CC&R's he drafted (and the norm for CC&R's). In its statement of decision, the trial court found the section contained a typographical error and was intended to read as we have recited. The Association does not challenge the court's conclusion, but does assert the Board in good faith believed that by not enforcing the CC&R's as to palm trees, it had waived the right to do so.

reviewed the CC&R's prior to closing escrow and understood that section 7.18 would protect his view from the trees.

There was evidence the Association routinely enforced section 7.18 of the CC&R's as to other tree species, ordering homeowners to trim their trees when they exceeded the height of the house. There was also evidence that when approving an individual homeowner's landscape plans in 1991, the ARC specifically did so on the condition that if any approved tree grew to a height where it became a view obstruction, the owner would be required to have the tree topped, trimmed, or removed. And on at least one occasion in 1992, the ARC advised a homeowner that palm trees (apparently planted without ARC approval), had become a view obstruction from adjoining lots and must be removed or relocated to an area where they would not interfere with neighbors' views.

Christakes, who served on the Board for many years, owned a property on which over 20 palm trees are planted, several of which are among those now blocking Plaintiffs' views. He participated over the years in Board actions concerning the enforcement of section 7.18 of the CC&R's, consistently taking the position that section 7.18 could not be enforced as to palm trees. When a resident suggested Christakes had a conflict of interest as to the applicability of section 7.18 to palm trees, Christakes told her that since he had lost his own ocean view due to construction outside the development, he did not care if she lost hers as well, and if she did not like the Board's decision to exclude palm trees completely from enforcement under section 7.18, she could file a legal action.

*View Homeowners Start to Complain*

Sometime in 2002, various homeowners, including some of the Plaintiffs, saw their views being slowly eroded by growing palm trees. They demanded the Association enforce section 7.18 of the CC&R's and require the offending trees be trimmed (or removed). The majority of the Board was of the opinion the aesthetic benefit to the entire community from the maturing and now very lush looking palm trees outweighed the value of preserving views of just a few homeowners. Since then, the community has been divided into two contentious factions: those opposing any effort to top or remove any existing palm tree and those wanting palm trees that obstruct individual homeowners' views topped or removed.

In May 2002, the Board asked its then attorney, Gary Dapelo, for a legal opinion as to the interpretation of the CC&R's and the Board's responsibilities regarding enforcement of the CC&R's as to palm trees. Dapelo opined the CC&R's did not give any homeowner a right to maintain an existing view

because section 7.10 acknowledged grading and construction of improvements could impair an existing view. Section 7.18 gave the ARC (which in this case was the Board) sole discretion to decide that a tree did not obstruct a view and thus trimming or removal of the tree was not required. Dapelo opined that consistent with that discretion, the Board could exempt all palm trees entirely from enforcement. Dapelo also concluded homeowners with palm trees had defenses they could assert to any attempt to enforce section 7.18 of the CC&R's making it unlikely the Association would prevail in any attempt to require any palm tree be trimmed or removed.

In June 2002, the Board sent a memorandum to all homeowners advising them it had decided it would be unreasonable to require any homeowner to top or remove any palm tree in the community. It referred homeowners to a set of Board rules and regulations adopted in 1996, in which palm trees were specifically excluded from section 7.18 of the CC&R's, and which stated palm trees need only be trimmed to remove dead fronds.

In 2003, a newly elected Board member, who sympathized with the homeowners wanting to preserve their views, prevailed upon the Board to obtain a second legal opinion. It had been discovered that Christakes had a close personal relationship with Dapelo, who was inexperienced in representing homeowners associations. In 2004, the Association retained Attorney Richard Tinnelly to review the matter.

In May 2004, Tinnelly advised the Board that section 7.18 of the CC&R's protected views from being obscured by trees growing above roof height on the lot where the tree was located, and the Board had no authority to exclude palm trees from application of the CC&R's. Tinnelly advised the Board that CC&R's section 7.10, concerning view impairment, applied to construction of physical improvements on properties, such as houses, fences, and decks, but did not apply to view obstruction by trees, because that was specifically covered by section 7.18. He advised the Board it had no authority to promulgate rules and regulations that directly contradicted the express protection provided in the CC&R's. Tinnelly advised the Board that if it wanted to continue with its policy of the wholesale exclusion of palm trees from the ambit of section 7.18, it would have to amend the CC&R's, a prospect Tinnelly believed had little chance of success.

Tinnelly recommended to the Board that as to existing palm trees, it should ascertain which specific palm trees interfered with views and as to those trees, the Board should determine which were planted with ARC approval (as part of a homeowner's approved landscaping plan), and which were planted without approval. As to palm trees planted with ARC approval, Tinnelly believed the homeowner might have a detrimental reliance defense to forced

removal of the tree and the Board would need to look at each case individually to determine the possibility of success in any attempt to have the trees removed. Tinnelly advised the Board to require trimming or removal of unapproved palm trees growing above rooflines if it determined the tree blocked a view. He believed the Board did have discretion to formulate a definition of "view."

The Board then attempted to amend the CC&R's to exempt palm trees entirely from section 7.18, but could not garner sufficient homeowner votes. After the amendment attempt failed, one Board member commented within hearing of a homeowner that the Board could adopt regulations defining what constituted a "view" so narrowly that no palm tress would have to be removed.

*Litigation Begins*

In September 2004, Ekstrom wrote to the Board again about the palm trees obstructing his view. The Board did not respond. In November, Plaintiffs' attorney wrote to the Board demanding it begin enforcing section 7.18 as to palm trees that were obstructing Plaintiffs' views, and requesting mediation of the dispute.

At a board meeting on December 9, 2004, Tinnelly again urged the Board to start enforcing section 7.18 as to palm trees. He also urged the Board to engage in mediation with Plaintiffs. Christakes commented that 75 percent of the homeowners did not want any palm trees removed and Plaintiffs should be forced to "spend their own money if they want to sue to have trees removed." The Association refused to participate in mediation, and Plaintiffs filed this action on December 17, 2004, seeking enforcement of the CC&R's. Plaintiffs' declaratory relief cause of action sought a declaration the Association had a duty to enforce section 7.18 as to growing palm trees, and sought an injunction directing the Board to appoint a committee to make a determination as to which palm trees obstructed Plaintiffs' views and to direct that those trees be trimmed or removed as necessary.[3]

*The Board Adopts New Rules Concerning Palm Trees*

While this lawsuit was pending, the Board adopted new rules and regulations concerning the enforcement of section 7.18 of the CC&R's as to palm trees. The 2006 rules defined "view" as used in section 7.18 as being only that which is visible from the back of the view house, six feet above ground level, standing in the middle of the outside of the house looking straight

---

[3] The complaint also contained causes of action against individual Board members and the Association's property management company. The individual Board members were dismissed after a successful summary judgment motion, and the management association settled.

ahead to infinity, with nothing to the left or right of the lot lines being considered part of the home's view. This definition of "view" precluded most of Plaintiffs from claiming any view obstruction from palm trees either because of the shape of the lot (for example the Ekstroms' lot was pie shaped with the narrow point being at the back of the lot), or because Plaintiffs' primary view was from the second floor of the house, not the first.

The 2006 rules provided no palm tree planted before adoption of the rules would be removed without the tree owner's approval. If the owner of the palm tree agreed to permit a palm tree to be removed, the owner of the view lot would have to pay the cost of removal. The rules set out requirements for trimming and maintenance of each palm tree species (e.g., how many fronds the palm tree could have, which direction the fronds could be pointing, how often a palm tree owner could be required to trim the tree).

*Statement of Decision*

In its statement of decision, the trial court concluded section 7.18 was included in the CC&R's to preserve ocean and golf course views. There was nothing unclear or ambiguous in the terms used. The provision required *all* trees be trimmed down to the height of the roof of the house on the lot where they sit if the trees obstruct the view from another lot. In the context of the CC&R's, the plain meaning of the term " 'trimmed' means removed, as by cutting, or cut down to a required size." The word "[obstruct] means to block from sight or be in the way of (and thus even one palm frond would block some portion of a view)" and the term "[view] means that which is visible to the naked eye while standing, sitting or lying down anywhere in one's home, or anywhere on one's Lot, looking in any direction one wishes." The court rejected the restrictive definition of view as used in the 2006 rules as being in conflict with the CC&R's.

The trial court concluded section 7.18 (trees must be trimmed) did not conflict with section 7.10 (view impairment from improvements), because the latter provision did not apply to trees or vegetation. It found requiring palm trees be trimmed or topped (even assuming trimming would result in death of the tree) was not unfair to the tree owners as they acquired their properties with knowledge of section 7.18 and its requirement their trees could not be permitted to grow to block views from other lots. The court rejected the Association's argument section 7.18 gave the ARC discretion to allow all palm trees that exceeded the roof height of the house. That sentence gave the ARC discretion to decide whether a particular palm tree obstructed a neighbor's view, but not to allow a palm tree that did in fact block a view to remain untrimmed.

In its statement of decision, the court rejected the Association's various defenses. The hardship on view lot owners if views (for which they paid a premium price) were destroyed outweighed the hardship on the owner of a palm tree if required to trim or remove the tree. There was no hardship to the Association because the CC&R's require the owners of trees to bear the expense of trimming, and the possibility of lawsuits against the Association by tree owners was speculative.

The four-year statute of limitations applicable to actions to enforce CC&R's (Code Civ. Proc., § 337) did not commence until homeowners demanded enforcement of the CC&R's in 2002, which was when their views started becoming obscured. The court concluded there was no basis for concluding the Association was estopped to enforce the CC&R's (by having approved landscaping plans), and there was no evidence to support a waiver (by failing to enforce the CC&R's) defense.

The court rejected several additional affirmative defenses because they had not been pled by the Association in its answer, or raised by it during trial, but were referenced for the first time in the Association's request for a statement of decision. They included the business judgment-judicial deference rule, the litigation committee defense, and failure to join indispensable parties. The court also rejected those defenses on the merits as well. The business judgment-judicial deference rule did not apply to acts beyond the authority of the Board. The adoption of the 2006 rules did not resolve the matter because the rules conflicted with the CC&R's. The "litigation committee" defense was applicable only in the context of shareholder derivative suits. And owners of lots with palm trees that might eventually need to be removed were not indispensable parties to this action.

*The Judgment*

In its judgment, the court ordered the Association to enforce section 7.18 as to palm trees. It ruled that consistent with the CC&R's, the ARC had discretion, to be exercised in good faith, to determine whether any particular palm tree exceeding roof height in fact blocked a view, but the Association did not have discretion to exempt from enforcement palm trees that were found to block views. The ARC's approval of a landscaping plan that included palm trees did not exempt the palm tree from the requirements of section 7.18. The judgment defined " 'view' " as "a view of the ocean or neighboring golf course visible in any direction from anywhere on a home-owner's lot, inside or outside one's house." It defined " 'obstruct' " as "to block from sight or be in the way even partially, and thus even one palm frond could block some portion of a view." Neither Plaintiffs nor the Association had waived their rights to enforce the CC&R's. The individual

homeowners with trees violating section 7.18 were not indispensable parties, and principles of res judicata would operate to bind all homeowners to the judgment. The judgment ordered the Association "to enforce [s]ection 7.18 and to utilize every enforcement mechanism available to it under the CC&Rs and the law in order to do so." The court retained jurisdiction to enforce the judgment including jurisdiction to appoint a special master to ensure the Association's compliance with the judgment. Plaintiffs were declared the prevailing parties and awarded their costs and attorney fees.

## DISCUSSION

### 1. *Standard of Review*

An appealed judgment or order is presumed to be correct, and the appellant bears the burden of overcoming that presumption. (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1657 [57 Cal.Rptr.2d 525].) Plaintiffs sought and obtained declaratory relief and injunctive relief. Generally, the trial court's decision to grant or deny such relief will not be disturbed on appeal unless it is clearly shown its discretion was abused. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849–850 [39 Cal.Rptr.2d 21, 890 P.2d 43] [injunctive relief]; *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974 [97 Cal.Rptr.2d 280] (*Dolan-King*) [declaratory relief].) Where, however, the essential facts are undisputed, "in reviewing the propriety of the trial court's decision, we are confronted with questions of law. [Citations.] Moreover, to the extent our review of the court's declaratory judgment involves an interpretation of the [CC&R's] provisions, that too is a question of law we address de novo. [Citations.]" (*Ibid.*)

### 2. Lamden *Judicial Deference Rule*

The Association contends the "judicial deference rule" adopted by the California Supreme Court in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 [87 Cal.Rptr.2d 237, 980 P.2d 940] (*Lamden*), which is an adaptation of the business judgment rule applicable to directors of corporations, precludes judicial review of any of its decisions concerning the enforcement or nonenforcement of section 7.18 of the CC&R's as to palm trees. We disagree.

" 'The common law business judgment rule has two components—one which immunizes [corporate] directors from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest.' [Citation.] A hallmark of the business judgment rule is that, when the rule's

requirements are met, a court will not substitute its judgment for that of the corporation's board of directors. [Citation.]" (*Lamden, supra*, 21 Cal.4th at p. 257.)

In *Lamden*, the owner of a condominium unit objected to the association's board of directors' decision to spot treat for termites rather than tenting and fumigating the entire building. The Supreme Court adopted a rule it termed as analogous to the business judgment rule, holding, "where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Lamden, supra*, 21 Cal.4th at pp. 253, 265.) The Supreme Court adopted the association's position, at least as far as ordinary managerial decisions are concerned: "Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments." (*Id.* at pp. 270–271.)

■ *Lamden*'s holding, however, is not so broad as the Association asserts. It applied the "rule of judicial deference to community association board decisionmaking" where owners "seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors. [Citation.]" (*Lamden, supra*, 21 Cal.4th at pp. 253, 260.) And *Lamden* did not purport to extend judicial deference to board decisions that are outside the scope of its authority under its governing documents. *Lamden* specifically reaffirmed the principle that, " 'Under well-accepted principles of condominium law, a homeowner can sue the association for damages and an injunction to compel the association to enforce the provisions of the declaration.' [Citation.]" (*Id.* at pp. 268–269, citing *Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1246–1247 [280 Cal.Rptr. 568] and *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 [191 Cal.Rptr. 209].)

Plaintiffs contend the Association has waived the application of the *Lamden* rule of judicial deference because it is in the nature of an affirmative defense that was not pled in the Association's answer or litigated at trial. The Association responds it was not required to raise the *Lamden* rule below because the rule merely embodies the proper standard of judicial review—it is not a defense at all. But the very language used in *Lamden* indicates judicial deference is owed only when it has been shown the Association acted after "reasonable investigation, in good faith and with regard for the best

interests of the community association and its members . . . ." (*Lamden, supra,* 21 Cal.4th at pp. 253, 265.) A defense of good faith is necessarily factual in nature. (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 432 [8 Cal.Rptr.3d 31].) Just as the corporate business judgment rule, which is a rule of judicial deference to good faith management decisions of corporate boards, is a defense (see *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1157 [96 Cal.Rptr.2d 128]), so too is the rule of judicial deference to decisions of homeowner association boards articulated in *Lamden.* An affirmative defense may be waived if it is not raised below. (*California Academy of Sciences v. County of Fresno* (1987) 192 Cal.App.3d 1436, 1442 [238 Cal.Rptr. 154].) The defense was raised for the first time after trial in the Association's request for a statement of decision. The trial court correctly ruled the Association waived application of the *Lamden* rule of judicial deference by not raising it earlier.

Even if the judicial deference rule was not waived, we conclude the trial court correctly found it inapplicable in this instance. We consider the rule in two contexts. First, we consider whether the Association's position prior to the institution of this litigation that it could simply exempt all palm trees from the purview of section 7.18 of the CC&R's is entitled to judicial deference. Second, we consider whether the Board's adoption of the 2006 rules concerning the enforcement of section 7.18 as to palm trees is entitled to judicial deference.

■ The former issue is not so hard. We review the interpretation of the CC&R's de novo. (*Dolan-King, supra,* 81 Cal.App.4th at p. 974.) Section 7.18 is not at all ambiguous. It provides that "[*a*]*ll* trees, hedges and other plant materials shall be trimmed by the Owner of the Lot upon which they are located so that they shall not exceed the height of the house on the Lot . . . ." (Italics added.) If, however, the ARC determines the trees "do not obstruct the view from any of the other Lots" then the trees do not need to be so trimmed (i.e., they may exceed the height of the house). The only reasonable construction to be given to the provision is that homeowners are afforded protection from having their views obstructed by vegetation, including trees. Nothing in the CC&R's permits the Association to exclude an entire species of trees from section 7.18's application simply because it prefers the aesthetic benefit of those trees to the community. Even if the Board was acting in good faith and in the best interests of the community as a whole, its policy of excepting all palm trees from the application of section 7.18 was not in accord with the CC&R's, which require *all* trees be trimmed so as to not obscure views. The Board's interpretation of the CC&R's was inconsistent with the plain meaning of the document and thus not entitled to judicial deference. (*Lamden, supra,* 21 Cal.4th at pp. 253, 265.)

The Association also argues the trial court was required to defer to the Association's decision in 2006 to adopt rules to enforce section 7.18 as to palm trees. It urges the new rules represent an appropriate balance between the community's interest in maintaining the palm trees and the individual homeowners' interests in preserving their existing views. Accordingly, the Association argues the 2006 rules render moot the entire dispute.

■ We disagree the new rules are entitled to judicial deference under *Lamden*. As with the Board's prior policy that palm trees are exempt from the CC&R's, the new rules are in direct conflict with the CC&R's. The rules specifically exclude *all* palm trees planted before 2006—which basically means all trees that might currently obscure Plaintiffs' views. But section 7.18 does not grant the Association discretion to exclude view-blocking trees, it only gives the ARC discretion to determine whether or not a particular tree blocks a view. Furthermore, the new rules established what might best be called a "bowling alley" definition of what constituted view. Even if the Board had some discretionary authority to define what was meant by "view," it was not free to fashion a definition that rendered section 7.18 meaningless. (See *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380–381 [33 Cal.Rptr.2d 63, 878 P.2d 1275] [CC&R's to be interpreted according to rules of contracts with view toward enforcing reasonable intent of parties].)

The Association cites *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809 [76 Cal.Rptr.3d 41], for the proposition the trial court was required to defer to the Association's chosen method for enforcing the CC&R's, i.e., the 2006 rules. In *Harvey*, the association board permitted owners of units adjacent to common area attic space to utilize portions of the common area for exclusive storage. (*Id.* at p. 813.) The appellate court concluded the association board acted according to the authority granted to it in the CC&R's. "The CC&R's make clear the Board has the 'sole and exclusive' right to 'manage' the common area . . . ; to 'adopt reasonable rules and regulations not inconsistent with the provisions contained in [the CC&R's]' relating to that use . . . ; to designate portions of the common area as 'storage areas' . . . ; and to authorize it to allow an owner to use exclusively portions of the common area 'nominal in area' adjacent to the owner's unit, provided such use 'does not unreasonably interfere with any other owner's use or enjoyment of the project.' " (*Id.* at pp. 818–819, fn. omitted.) *Harvey* went on to conclude the *Lamden* rule of judicial deference applied to more than just ordinary discretionary maintenance decisions. "Under the 'rule of judicial deference' adopted by the court in *Lamden*, we defer to the [b]oard's authority and presumed expertise regarding its sole and exclusive right to maintain, control and manage the common areas when it granted the fourth floor homeowners the right, under certain conditions, to use up to 120 square feet of inaccessible attic space common

area for rough storage." (*Harvey, supra,* 162 Cal.App.4th at p. 821.) *Harvey* is inapposite. In *Harvey,* the board was acting consistently within the authority granted it in the CC&R's. Here, the CC&R's do not give the Board discretion to act as it did.

## 3. *Vagueness and Overbreadth*

The Association contends the judgment is void because it is too broad and too vague. Specifically, the Association attacks the language in the judgment ordering it not just to begin enforcing section 7.18, but "to utilize every enforcement mechanism available to it under the CC&Rs and the law in order to do so."

■ The Association first contends this language is too broad and impermissibly interferes with its discretion to determine how (and whether and when) to enforce the CC&R's. It cites us to *Lamden, supra,* 21 Cal.4th 249, *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863 [63 Cal.Rptr.3d 514], and *Beehan v. Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858 [137 Cal.Rptr. 528], for the proposition the Association alone has discretion to determine how to enforce its CC&R's. But as noted in *Lamden,* when an association refuses to enforce its CC&R's, a homeowner may seek an injunction compelling it to do so. (*Lamden, supra,* 21 Cal.4th at p. 268 [" '[u]nder well-accepted principles of condominium law, a homeowner can sue the association for damages and an injunction to compel the association to enforce the provisions of the declaration' "].) In view of the Association's historical position that it need not and would not enforce section 7.18 as to palm trees, a directive that it utilize all enforcement mechanisms available is necessary to ensure the Association does not simply now make a token effort.

The Association also complains the directive that it "utilize every enforcement mechanism available to it under the CC&Rs and the law" is vague because it could be construed as a directive that it commence legal action against specific homeowners who have not been identified. To satisfy the requirement that injunctions concerning real property be specific, the Association argues the judgment must specify "against which homeowners, what properties, and with respect to what trees" it must act. It complains the lack of such direction in the judgment "severely impairs" its ability to comply with the judgment. We disagree.

Under section 7.18, it is the Association, through its ARC, that has the sole discretion under the CC&R's to determine whether a specific palm tree that has grown beyond rooftop height "obstruct[s] the view from any of the other Lots . . . ." Until now, the Association has simply avoided any exercise of this

·discretion by taking the position *all* palm trees are excluded from the directive. Until the Association begins to do its job, the specific trees that must be trimmed will not be identified. The judgment is sufficiently clear as to what the Association must do. It must comply with its obligations by exercising its discretion "in good faith" to determine which trees obstruct Plaintiffs' views and it must then undertake the procedures outlined in the CC&R's to enforce the CC&R's as to those trees. The Association cannot feign ignorance of what it should do—it has apparently had no difficulty figuring out how to carry out its responsibilities as to other tree species and has in the past required homeowners to trim or remove such trees.

We are equally unimpressed by the Association's assertion it should not be required to act at all to enforce section 7.18 as to palm trees because it has not been told how far it must go—specifically, whether it must go so far as to commence legal action. The trial court specifically retained jurisdiction to oversee enforcement. (See *Molar v. Gates* (1979) 98 Cal.App.3d 1, 25 [159 Cal.Rptr. 239].) It is pure speculation as to whether legal action against any homeowner will be necessary. And whether the Association should ultimately seek injunctive relief against any tree owner will have to be judged by the facts in existence at that time. (See *Beehan v. Lido Isle Community Assn.,* *supra,* 70 Cal.App.3d at p. 866 [refusal of association to seek injunctive relief against homeowner in violation of CC&R's "must be judged in light of the facts at the time the board consider[s] the matter"].) In current economic times, it might make little economic sense for the Association to pursue costly litigation against individual homeowners who refuse to comply with the CC&R's, particularly since it is all the homeowners, including Plaintiffs, who will ultimately bear the cost of such litigation. And in such case, Plaintiffs are certainly free to pursue their own litigation against individual homeowners to compel removal of any specific offending palm trees. (See *Lamden, supra,* 21 Cal.4th at p. 268 [homeowner can sue directly to enforce CC&R's].)

### 4. *Failure to Join Indispensable Parties*

The Association contends the judgment is void because Plaintiffs failed to join as defendants the individual homeowners whose palm trees are obstructing their views as required by Code of Civil Procedure section 389. Accordingly, it argues the court in essence permitted an involuntary defense class action in which the rights of the individual tree owners have been adjudicated without their participation in this lawsuit. Because the Association did not raise this issue until after trial, in its request for a statement of decision, it has waived the argument on appeal. (*McKeon v. Hastings College* (1986) 185 Cal.App.3d 877, 889 [230 Cal.Rptr. 176].) Furthermore, Civil Code section 1368.3 provides an association may defend litigation concerning enforcement of CC&R's without joining the individual homeowners in the association.

## DISPOSITION

The judgment is affirmed. The Plaintiffs are awarded their costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.