Filed 9/23/25  Cruce v. Gabay CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JAMES CRUCE et al., | B343437 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 21VECV00960, consolidated with 21VECV01006) |
| v. | |
| MOSHE GABAY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Virginia Keeny, Judge.  Affirmed.

Kulik Gottesman Siegel & Ware, Thomas M. Ware II and Elmira Tofanyan for Plaintiffs and Appellants.

The Law Office of Yossi Noudel, Yossi Noudel; Fernald & Zaffos and Clay R. Wilkinson for Defendants and Respondents.

—————————————

This case requires we interpret a restrictive covenant that forbids the construction of anything other than "a detached, single family dwelling and private garage" on lots in a San Fernando Valley neighborhood. Plaintiffs and appellants James Cruce and Robert Borsuk, homeowners in the neighborhood, argue that the covenant requires homes to be built with detached garages. They, along with three other plaintiffs, filed suit against defendants and respondents Moshe and Orit Gabay seeking to enjoin them from building a house with an attached garage. While the case was pending, the court denied the plaintiffs' request for a preliminary injunction, and the Gabays completed construction and received a certificate of occupancy. The plaintiffs argue the trial court erred by granting summary judgment in favor of the Gabays, and that the plain meaning of the covenant requires detached garages. The plaintiffs alternatively contend there is a triable issue of fact as to the meaning of the covenant. We agree with the trial court's rejection of these arguments and affirm.

## FACTS AND PRIOR PROCEEDINGS

In October 1946, the owners of a tract of land in Sherman Oaks recorded a document entitled "Declaration of Restrictions" in anticipation of subdividing the tract into 138 lots suitable for the construction of single-family homes. (Capitalization omitted.) The document comprised a series of covenants that ran with the land. The two restrictions most relevant to this case appear in section A under the heading, "Purposes and Uses." (Capitalization omitted.)

"1.     The lots in said tract shall be used for no purpose other than the erection and construction of a detached, single family dwelling and private garage for not more than [three] cars

2

upon each such lot, which structures shall not exceed one and one-half stories in height, and shall have a ground floor area, excluding porches, patios, and garages, of not less than 1,200 square feet with respect to Lots 1 to 63, inclusive, and of not less than 1,400 square feet with respect to Lots 64 to 138, inclusive.

"2.     No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the [t]ract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used either as a residence or for any business, commercial, or professional purpose."

The document contained two additional sections restricting development within the tract. Section B established mandatory setbacks disallowing the construction of buildings within 25 feet of the front lot line, 10 feet of a side lot line bordering a street, or five feet of any other side lot line. This restriction was subject to two exceptions: (1) that "the exterior wall of a detached garage or other building, the front of which garage or outbuilding is located 70 feet or more from the front lot line, may be located not nearer than [one] foot from any side lot line"; and (2) "there shall be a clear distance of 10 feet between exterior wall lines of existing or future adjacent living quarters." Section C established an architectural committee to serve during the first five years of the covenants' existence, up to November 1, 1951. During that time, no structure could be built or altered without the committee's written approval "as to [the] conformity and harmony of [the] external design with existing structures in the subdivision, and as to [the] location of the building with respect to topography and finished ground elevation." Unless the majority of lot owners in the subdivision executed a written instrument establishing a new committee before the original committee's powers expired, no

prior approval of architectural design was to be required for homes built or altered after November 1, 1951.[1]

The subsequent history of the neighborhood can be pieced together from documents in the record. The vast majority of lots in the tract were developed between 1947 and 1950, and most of those original homes remain standing, though many have since been renovated. The construction of the Ventura Freeway in the late 1950s split the neighborhood in two, resulting in the loss of 13 lots and severing 24 lots located north of the freeway from the rest of the neighborhood.

The plaintiffs in this case are particularly concerned about the character of the neighborhood in the 101 remaining lots located south of the freeway. They are part of a group of homeowners who believe that new construction in the style of the Gabays' new home "is likely to change the whole fabric of the community" and will lead to "mansionization of the lots." The original homeowners did not create a new architectural committee before the powers of the original committee expired in 1951, and as a result, according to Cruce and Borsuk, "new purchasers do not seek architectural approval" before renovating

_____

[1] The declaration of restrictions also included a provision stating that "[n]o persons or any race other than the Caucasian race shall use or occupy any building or any lot," except for "domestic servants." Racially restrictive covenants are of course repugnant and unenforceable (*Shelley v. Kraemer* (1948) 334 U.S. 1, 20-21 [68 S.Ct. 836, 92 L.Ed. 1161]), but California law provides a method for eliminating such unconstitutional covenants from residential properties. (See Gov. Code, § 12956.2.) We assume for the purposes of this opinion that the remaining covenants are severable and continue to be enforceable.

4

or building new homes in the neighborhood. Because the Los Angeles Department of Building and Safety (LADBS) does not take restrictive covenants into account when issuing permits, the plaintiffs themselves have sought "to enforce the deed restrictions."

This was the state of affairs in January 2021 when the Gabays recorded a deed reflecting their purchase of a property within the tract located at 4512 Sunnyslope Avenue. Less than a month later, an attorney representing a group of homeowners sent the Gabays a letter welcoming them to the neighborhood and notifying them of the declaration of restrictions. The attorney wrote, "[t]he purpose of this letter is to put you on notice that your neighbors object to, and are prepared to take steps to enjoin, any efforts to mansionize the property, construct a second story, or eliminate the detached garage on the property."

In June 2021, the attorney sent another letter stating that "[i]t appears from your pending building permit for a 'single family dwelling [with ]attached garage,' you have chosen to ignore the prior notice." The letter continued, "If you proceed with attempts to construct a house on the property with an attached garage, we are prepared to file an action to enjoin your construction and development!" (Boldface and capitalization omitted.)

In July, five of the neighbors—Cruce, Borsuk, Ruth Holzman, and Catherine and Guillaume Rocheron—filed a complaint against the Gabays. They alleged that the construction of a home with an attached garage violated the declaration of restrictions, and sought injunctive and declaratory relief to prevent the construction, as well as unspecified damages. The Gabays filed a motion for summary judgment asserting that

"[t]he only reasonable interpretation of the restrictive covenant at issue permits the use to which [the d]efendants intend to put the [p]roperty."

The plaintiffs opposed the motion, arguing that the declaration of restrictions unequivocally forbade the construction of homes with attached garages. The plaintiffs also submitted extrinsic evidence in support of their interpretation, in the form of two neighborhood surveys by an architect. The architect found that, of the 101 lots located south of the freeway, only 15 had attached garages as of 2021. According to LADBS records, seven of these 15 homes had been built with attached garages between 1947 and 1950, during the initial phase of development. Two more homes were located directly adjacent to the freeway, and had been rebuilt with attached garages in 1963 after the lots were reconfigured as a part of freeway construction. Four additional homes had been built or remodeled with attached garages in more recent years, and the last two homes had attached garages of indeterminate age. The architect conducted a second survey in September 2024, and found that three additional homes in the tract now had attached garages, including the Gabays' new home, which by this point was complete.

The trial court granted the motion for summary judgment. In the court's view, the meaning of "detached, single family dwelling and private garage" was unambiguous: "[T]he court interprets 'detached' as primarily modifying 'single family dwelling,' presumably to prevent the construction of duplexes or multi-family dwellings. If the developers truly intended for garages to be 'detached,' they would have put the modifier immediately prior to the word 'garage,' to clearly indicate that it

6

was the garage that had to be detached.  Furthermore, as noted by [the plaintiffs], the Los Angeles Municipal Code [has] defined 'one family dwelling' as 'a detached dwelling containing only one dwelling unit' and a 'dwelling unit' defined as 'a group of two or more rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes.'  This definition does not preclude single-family homes from including an attached garage as part of their dwelling unit."

Cruce and Borsuk filed a timely notice of appeal.

## LEGAL BACKGROUND AND STANDARD OF REVIEW

In most regards, covenants, conditions and restrictions (CC&R's) on real property " 'are interpreted according to the usual rules of interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties.  [Citations.] Where . . . the trial court's interpretation of the CC&R's does not turn on the credibility of extrinsic evidence, we independently interpret the meaning of the written instrument.' " (*Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 635; accord, 6 Miller & Starr, Cal. Real Estate (4th ed. 2025) § 16:17.)  We do not adopt a "disjointed, single-paragraph, strict construction approach to a restrictive-covenant-document interpretation." (*Ezer v. Fuchsloch* (1979) 99 Cal.App.3d 849, 861.)  Instead, "[w]e must read the CC&R's as a whole and adopt the construction that gives effect to every part of the CC&R's." (*Bear Creek Planning Committee v. Ferwerda* (2011) 193 Cal.App.4th 1178, 1183.)  As with any other case involving contract interpretation, "[w]e review the interpretation of . . . CC&R's de novo." (*Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1123.)

7

There is one main exception to the rule that CC&R's are interpreted the same way as any other contract: "[R]estrictive covenants are construed strictly against the person seeking to enforce them." (*White v. Dorfman* (1981) 116 Cal.App.3d 892, 897.) Thus, "if there is more than one reasonable interpretation of a restrictive covenant, it is to be construed against the individual seeking to enforce it and in favor of the free use of land." (*Eisen v. Tavangarian*, *supra*, 36 Cal.App.5th at p. 639.)

## DISCUSSION

As we noted at the outset, the primary dispute in this case is how to interpret the phrase "detached, single family dwelling and private garage." In the plaintiffs' view, "detached" means that the dwelling and the garage must be detached from one another. The plaintiffs argue that what distinguishes a single-family dwelling from other forms of housing such as a duplex or an apartment building is that a single-family dwelling is not attached to any other housing unit. This is reflected in the relevant statutes both at the time the covenants were recorded and now. The Los Angeles Municipal Code defines the term one-family dwelling as "[a] detached dwelling containing only one dwelling unit." (L.A. Mun. Code, § 12.03.)[2] The most recent

_____

[2] The plaintiffs claim this definition was present in the code at the time the declaration of restrictions was recorded, but we cannot find it in the 1946 edition of the code. The current version of the Los Angeles Municipal Code suggests that the definition was added or amended by an ordinance in 1956. (L.A. Mun. Code, § 12.03, available at https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-108304#JD_12.03> [as of Sept. 22, 2025].)

version of the Los Angeles Building Code defines "detached single-family dwelling" as "[a]ny single-family dwelling which is separated (detached) from adjacent buildings." (L.A. Building Code, § 202 (2023 ed.).) The Los Angeles Municipal Code in effect in 1946 does not contain a definition of "single family dwelling," but it uses the term in a manner consistent with the current definition. Thus, in a section on permissible uses in the R-1.5 zone, a medium-density residential zone, the code states that in certain circumstances, "there may be two single family dwellings or one two-family dwelling" constructed on a site. (L.A. Mun. Code, § 12.04.01(c) (1st ed. 1946) available at <https://babel.hathitrust.org/cgi/pt?id=uc1.l0090720038&seq=40> [as of Sept. 22, 2025].) There would be no need to distinguish between single family and two-family dwellings in this provision unless single family dwellings were understood as being detached from one another.

The plaintiffs argue that since "single family dwelling" by definition refers to a detached home, the addition of the word "detached" must mean something else, or it would be surplusage. In the plaintiffs' view, the only reasonable interpretation is that "detached, single family dwelling and private garage" means a dwelling detached from its garage. The plaintiffs point to other language in the covenants that they argue supports this interpretation. They note the use of the plural "structures" in the very next phrase, "which *structures* shall not exceed one and one-half stories in height." (Italics added.) In the plaintiffs' view, this implies that the dwelling and the garage are two separate structures. Finally, the plaintiffs note that section A.2 of the declaration of restrictions refers to a garage as an "outbuilding": "No trailer, basement, tent, shack, *garage*, barn *or other*

9

*outbuilding* erected in the [t]ract shall at any time be used as a residence temporarily or permanently . . . ." (Italics added.) The plaintiffs argue the term "outbuilding" likewise suggests a detached structure.

In their focus on individual details of the document, the plaintiffs have overlooked the broader picture. The primary purpose of section A of the declaration of restrictions was to forbid all construction apart from single family housing: "The lots in [the] tract shall be used for *no purpose other than* the erection and construction of a detached, single family dwelling and private garage . . . ." (Italics added.) By including garages as a permitted use, and using the plural "structures" to describe "single family dwelling and private garage," the drafters of the declaration made clear that detached private garages were allowed within the tract even though no one could live in them.[3]

But permitting the construction of detached garages, or even expecting that most lot owners will build them, does not mean that they are mandatory or that a homeowner may not build an attached garage as part of a "detached, single family dwelling." Both in the present day and in 1946, a single-family dwelling could have either an attached or detached garage. The

---

[3] The characterization of a garage as an "outbuilding" likewise suggests a detached structure, though this point is less clear—as the Gabays note, the document also refers to a basement as an outbuilding, even though a basement by definition is connected to another structure. The Merriam-Webster dictionary defines basement as "the part of a building that is wholly or partly below ground level." (Available at <https://www.merriam-webster.com/dictionary/basement> [as of Sept. 22, 2025], def. 1.)

current version of the Los Angeles Municipal Code defines the term private garage as "[a]n accessory building *or portion of a main building* designed or used for parking or storage of motor vehicles of the occupants of a residential use."  (L.A. Mun. Code, § 12.03, italics added.)  The 1946 municipal code did not define "private garage," but in the R1 zone, which allowed the construction of only one single-family dwelling on each lot, landowners were permitted to build "the usual accessories in connection with such dwelling, including garage space not to exceed that necessary for occupants of each dwelling."  (1946 L.A. Mun. Code, § 12.04(c), available at <https://babel.hathitrust.org/cgi/pt?id=uc1.l0090720038&seq=39 &q1=garage> [as of Sept. 22, 2025].)  The code defined "[g]arage [s]pace" as "a permanently maintained space within a building and of adequate size to permit the housing and storage of an average sized automobile."  (*Id.*, § 12.00.)  Nothing in either code section prevented a "garage space" from being attached to a dwelling.

The use of the word "detached" immediately before "single family dwelling" does not change this meaning.  As its appearance in the Los Angeles Building Code shows, "detached single family dwelling" is a common term in construction and signifies that the dwelling is detached from other buildings, not that it has no attached garage.  The use of the word "detached" in the phrase "detached, single family dwelling" may be in some sense redundant,[4] but it is no more redundant than other

---

[4] Even this is not necessarily the case.  Although "single-family attached dwelling" is not used in Los Angeles zoning and building laws, the term is used elsewhere to refer to a townhouse

11

common expressions, from "aid and abet" or "devise and bequeath" to "covenants, conditions and restrictions."  To interpret the term in this context as having something other than its ordinary meaning, with the word "detached" modifying "garage" rather than "single family dwelling" would distort the document, not elucidate it.[5]  Indeed, when the drafters of the declaration of restrictions wanted to refer only to detached garages, they knew how to do so.  In section B.1 of the document, which establishes minimum setbacks, they allowed for "the exterior wall of a detached garage" to come closer to a side lot line than the dwelling unit was allowed to do.  We agree with the trial court that if these drafters had intended to require detached garages on every lot, they would have used similarly explicit language in section A.1.

Because the language of the declaration of restrictions " 'is clear and explicit and does not involve an absurdity, the plain meaning governs.' " (*Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447.)  Even if the

---

that occupies its own lot but shares a wall with a neighboring property along a lot line.  (E.g., Biggs Mun. Code, § 14.20.340, available at <https://ecode360.com/46677559?highlight=single-family&searchId=6642538986609070#46677547> [as of Sept. 22, 2025]; Fontana 6th Cycle Housing Element Update (2021-2029) (Feb. 8, 2022, Res. No. 2022-011) p. 3-17, available at <https://www.fontanaca.gov/DocumentCenter/View/37230/Fontana-Housing-Element_July-2022> [as of Sept. 22, 2025].)

[5] The plaintiffs ascribe significance to the declaration's use of a comma in "detached, single family dwelling and private garage," but we do not understand how the comma alters the meaning of this common term.

plaintiffs' proffered interpretation was reasonable, which we do not think it is, when "there is more than one reasonable interpretation of a restrictive covenant, it is to be construed against the individual seeking to enforce it and in favor of the free use of land." (*Eisen v. Tavangarian*, *supra*, 36 Cal.App.5th at p. 639.)

Lastly, even if the plaintiffs' proffered extrinsic evidence was somehow relevant, it does not help their case. The plaintiffs argue that their architectural survey "demonstrat[es] that for nearly 80 years the [d]eclaration has been interpreted to prohibit attached garages," but in fact it does just the opposite. The plaintiffs focus on the finding that a large majority of homes in the neighborhood were built with detached garages. But the survey also shows that at least seven[6] homes were built with attached garages during the original phase of development in the late 1940s. Thus, although homes with detached garages were the norm, they were never the only acceptable design in the neighborhood. Prior to 1951, all home plans were required to be submitted to an architectural committee for approval of their "conformity and harmony of external design with existing structures in the subdivision," but there is no indication that the committee objected to the design of any of these seven homes based on a lack of harmony or violation of the declaration of restrictions. The plaintiffs' extrinsic evidence shows that the majority of homeowners in the neighborhood chose to build

---

[6] The number may be higher, as the architect who conducted the survey was unable to determine whether two homes with attached garages were originally constructed that way in the 1940s.

13

homes with detached garages.  It does not show that attached garages were ever prohibited, nor that anyone in the nearly 80-year history of the neighborhood ever objected to them prior to the plaintiffs and their associates.

The plaintiffs' desire as stated in their pre-complaint demand letter to use the covenants to oppose any new construction in the neighborhood that changes what they view as its character is misplaced.  Even if the plaintiffs were successful in this case, they could not force the Gabays to build a home in a midcentury style with a garage located at the rear of the property; they could only require the Gabays to move their garage a minimal distance from the rest of their home, inconveniencing them but not changing the aesthetics of the house.  Originally, the covenants did provide a mechanism for residents to approve their neighbors' aesthetic choices, in the form of the architectural committee.  But that committee ceased to exist nearly 75 years ago.  As a result, the plaintiffs may enforce only the specific requirements set out in the declaration of restrictions.  A detached garage is not one of them.

## DISPOSITION

The judgment of the trial court is affirmed.  The Gabays are awarded their costs on appeal.

NOT TO BE PUBLISHED.


WEINGART, J.


We concur:



BENDIX, Acting P. J.



M. KIM, J.



15